(No. 46896 )

*In re* ROBERTS PARK FIRE PROTECTION DISTRICT, Petitioner.—(Roberts Park Fire Protection District, Appellee, v. The Village of Bridgeview, Appellant.)

*Opinion filed Sept. 26, 1975.—Rehearing denied Nov. 21, 1975.*

Ancel, Glink, Diamond & Murphy, of Chicago (Louis Ancel, Marvin J. Glink and Barry S. Shanoff, of counsel), for appellant.

Irving Goodman and Smietanka & Ggan, both of Chicago, for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

This action commenced in 1965 in the circuit court of Cook County when the Roberts Park Fire Protection District (hereinafter District) filed a petition seeking to avoid the disconnection by operation of law of a certain area of the Village of Bridgeview (hereinafter Village) which is located within the fire protection district. Following an evidentiary hearing in 1972 the trial court dismissed an amended petition that had been filed by the District. The appellate court reversed (*In re Roberts Park Fire Protection District*, 20 Ill. App. 3d 282), and we granted leave to appeal. The Village contends, basically,

that the trial court's decision was not against the manifest weight of evidence and that the appellate court construed the language of the applicable statute too narrowly.

Section 20 of "An Act in relation to fire protection districts" was enacted in 1965 (Ill. Rev. Stat. 1965, ch. 127½, par. 38.3), and provided that:

> "Any territory within a fire protection district that is or has been annexed to a city, village or incorporated town that provides fire protection for property within such city, village or incorporated town is, by operation of law, disconnected from the fire protection district as of the January first after such territory is annexed to the city, village or incorporated town, or in case any such territory has been so annexed prior to the effective date of this amendatory Act of 1965, as of January 1, 1966. Such disconnection by operation of law does not occur if, within 60 days after such annexation or after the effective date of this amendatory Act of 1965, whichever is later, the fire protection district files with the appropriate court a petition alleging that such disconnection will cause the territory remaining in the district to be noncontiguous or *that the loss of assessed valuation by reason of such disconnection will impair the ability of the district to render fully adequate fire protection service to the territory remaining with the district.* When such a petition is filed, the court shall set it for hearing, and further proceedings shall be held, as provided in Section 15 of this Act. At such hearing, the district has the burden of proving the truth of the allegations in its petition. If there are any general obligation bonds of the fire protection district outstanding and unpaid at the time such territory is disconnected from the fire protection district by operation of this Section, such territory shall remain liable for its proportionate share of such bonded indebtedness and the fire protection district may continue to levy and extend taxes upon the taxable property in such territory for the purpose of amortizing such bonds until such time as sufficient funds to retire such bonds have been collected." (Emphasis added.)

The District filed the petition alleging that part of its territory had been annexed to the Village prior to the

effective date of the amendatory act and that the loss of assessed valuation by reason of the disconnection would impair its ability to render fully adequate fire protection service to the remaining territory in the District. No question is raised that this petition was not timely filed. The amended petition, from the dismissal of which this appeal is taken, additionally maintained that certain provisions of section 20, which prescribe automatic disconnection, were unconstitutional, because they impaired the obligation of contracts entered into by the District.

Prior to a hearing the parties entered into a stipulation which set forth the total assessed value of all real property within the District and within that portion of the District inside the Village, the total tax rate, and the totals of taxes extended and received for the tax years 1968-1971. That information is as follows:

| | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|
| Assessed value of all District property | $41,937,846 | $51,836,860 | $61,418,325 | $70,507,052 |
| Tax Rate | 0.10 | 0.098 | 0.278 | 0.256 |
| Assessed value of District property within Village | 8,361,051 | 10,872,236 | 14,606,328 | 17,093,585 |
| Taxes extended | 41,938 | 50,800 | 170,743 | 180,498 |
| Taxes received by District | 38,454 | 45,133 | 168,841 | — |

The stipulation also provided that "heretofore both the Village of Bridgeview and the Roberts Park Fire Protection District have rendered fully adequate fire protection service to the territory within their respective corporate limits." No issue is presented as to the propriety of considering the financial situation existing from 1968 to 1972 in determining whether there would be an impairment of the District's ability to provide fire protection.

At a hearing held in December 1972, Robert Rasch, the fire chief for the District since 1965, testified that the District is staffed by 4 full-time firemen and 35 volunteer firemen. He defined "fully adequate" fire protection as

occurring when there are "no fire losses." Having stated he was familiar with fire protection activities and with the financial operations of the District, he related that in his opinion the loss of 24% or 25% of revenue due to the loss of assessed valuation by the disconnection of the Village area would not permit the District to render fully adequate fire protection to the area remaining after disconnection. He said the District had the bare minimum of equipment necessary to provide fully adequate protection to the entire District. The annual report prepared by Rasch was entered in evidence. It revealed that for 1972 the District responded to 816 alarms, and of these 180 or 22% occurred within the boundaries of the Village. On cross-examination Rasch admitted that his knowledge of the financial operations of the District was limited only to the knowledge of how much the District paid in total salaries and wages. He did not know the total assessed valuation of the District or of that part of the District within the Village boundaries.

The treasurer and a trustee of the District, Karl Biallas, testified that he prepared the budget appropriations for the 1972 (fiscal year May 1, 1972, to April 30, 1973) tax levy ordinance based on past years' expenditures. Various expenses covered in the appropriations of almost $212,000 were characterized by him as "fixed expenses," although certain of these expenditures arose only in the particular year, such as land acquisition. Biallas stated that even if the Village is disconnected the expenses of operation would remain the same, because they are "fixed expenses." In his opinion a loss of 24.5% of the District's revenue, which is the per cent received from the Village, would impair the District's ability to render adequate fire protection. He further testified that this loss of revenue would prevent the District from paying its fixed charges, and that there were no other sources of revenue available to recoup this loss. The tax levy for 1972 utilized a tax rate of .30%. Of the taxes extended, roughly 92% are

actually collected. The District is approximately $450,000 in debt as a result of the construction of new facilities and the purchase of equipment. The population of the District, according to Biallas, is about 30,000 people. There are 4,000 to 5,000 people residing in the Village area which receives the District's services.

During cross-examination Biallas indicated that the increase in appropriations for the tax levy ordinance over last year's disbursements was the result of the projected increase in costs of upkeep and maintenance. Although he stated that he based the appropriations on prior years' expenditures, he acknowledged that the appropriations for certain items, such as heat, water, electrical utilities, and salaries were not consistent with the much lower amounts disbursed in past years. He explained, however, that use of new facilities and the planned hiring of additional firemen made these increases necessary. The present indebtedness of the District was based upon contracts executed since 1970, which was at least 5 years after the filing of this action. Biallas believed the distinction between operating expenses and capital expenses was irrelevant, because the District would always have both types of expenses. He was aware the District could issue general obligation bonds, but the District had never considered using this means of revenue. Biallas admitted that during the previous fiscal year the District had made the full payment of over $50,000 required for the outfitting of certain fire vehicles.

The final witness called by the District was Emil Valovic, a fire protection consultant. He testified that he had made an in-depth study of the operations of the District. He surveyed the District and the area to be disconnected several times, and analyzed the water supplies available. He further reviewed the fire equipment of the District and the Village. Valovic stated that the area of the Village within the District comprises 30-35% of the District's total area. He determined the equipment and manpower needs of the District to adequately service the

area based upon this survey. In his opinion at least four additional "pumpers" should be purchased at a cost of $42,000 to $50,000 apiece, and there should be at least 20 full-time firemen. Valovic conceded on cross-examination that he was not a professional engineer and that his opinion of the equipment and manpower needs was based on his survey of the entire District, which included the area of the Village located within the District's boundaries.

Robert Murray, the Village fire chief, testified relative to the equipment and training programs of the Village fire department, which was composed of 19 full-time and 35 volunteer firemen. The area of the Village lying within the District is a combination of residential, light-heavy industrial, and mercantile. Murray characterized the remaining area of the District as primarily residential with single and multi-family dwellings. During cross-examination he expressed the opinion that in a primarily residential community of 25,000 people, four full-time firemen would be sufficient to provide adequate fire protection, if there was a coexistent well-trained and responsive volunteer force.

A municipal bond dealer and financial consultant to municipalities, Edward Benjamin, testified for the Village. He examined and evaluated the figures relating to the assessed valuation of the District and the District's financial report. He gave the opinion that the assessed value for the year of the 1972-1973 tax levy would be between $58,750,000 and $60,900,000. This he based upon the past rate of growth of assessed valuation in the District, not including that area within the boundaries of the Village. He stated that the financial records of the District disclosed that the District had no bonded indebtedness, which is the usual method of financing capital acquisitions by municipal corporations. He criticized the District's method of financing capital acquisitions on a cash basis as not accurately reflecting the costs of operations, because it bunches all expenditures into one category of disbursements without distinguishing annually

recurring expenses from capital items which are not necessarily annually recurring. Benjamin expressed the opinion that considering the expenditures the District is obligated to incur to provide fully adequate fire protection, the loss of assessed valuation by the disconnection of the Village area would not financially impair the District's ability to conduct its operations.

On cross-examination Benjamin said that he reached his projected growth for the District by determining the growth in assessed value for each of the past 3 years. He also considered the number of building permits issued for a specific area of the District during the last few years. He acknowledged, however, he had not made a personal survey of the District to determine the land available for continued growth. When asked whether the disconnection would impair the District's ability to render fully adequate fire protection, Benjamin responded that he was not qualified to answer. In reply to questioning by the court, he testified that in his opinion the District would have sufficient tax receipts following the disconnection to enable it to continue its operations and to retire its debts.

Boyd Hartley, an associate professor in the Department of Fire Protection and Safety Engineering at Illinois Institute of Technology, testified that he surveyed and studied the area of the District which lies outside the corporate limits of the Village. In his opinion the need for fire protection in the District following the disconnection would be less than what it is for the entire District. The equipment the District owns would be more than sufficient to give adequate protection to the area remaining after disconnection. The latter part of his opinion was predicated on the premise that the greatest area of fire hazard in the District is an area within the corporate limits of the Village of Justice, and both the District fire department and the Justice volunteer fire department respond on first call to alarms in that area. Hartley conceded during cross-examination that his survey of the

District did not include an inspection of the District firehouse, an examination of the District's equipment, or a consultation with the District fire chief. On redirect he expressed the opinion that the term "fully adequate" is entirely a subjective term and that it is the responsibility of the District trustees to determine what is fully adequate fire protection for their community. It was his belief that no community in the entire country has fully adequate fire protection.

Following the hearing the trial court found that the disconnection of that part of the Village located within the District would not impair the District's ability to furnish fully adequate fire protection to the remaining territory. The court also found that section 20 was not contrary to the Federal or State constitutions. In reversing the trial court the appellate court construed the language of section 20 to mean that no disconnection of territory from a fire protection district will be permitted if it will result in any impairment of the ability to maintain the required standard of "fully adequate" fire protection. That court stated, "even the slightest impairment of this standard should not be permitted. No criterion other than completeness can be accepted." (20 Ill. App. 3d 282, 288.) The appellate court found it was unnecessary to resolve the constitutional issue raised by the District.

The Village contends that section 20 "serves a necessary and proper function by eliminating double taxation and duplication of services" which occurs in circumstances similar to the present. It argues that the narrow and restrictive interpretation applied by the appellate court emasculates the intent of this statute. Moreover, the Village maintains that the loss of assessed valuation does not impair the District's ability to render fully adequate fire protection, since the District is not levying taxes at the maximum rate allowed by law.

In construing a statute the cardinal rule is to ascertain and give effect to the legislative intent as expressed in the

statute. (*People v. Dednam*, 55 Ill.2d 565, 568; *People ex rel. Hanrahan v. White*, 52 Ill.2d 70, 73.) This intent is to be determined "from the necessity or reason of the enactment and the meaning of the words, enlarged or restricted according to their real intent." (*People ex rel. Cason v. Ring*, 41 Ill.2d 305, 314.) A reading of section 20 indicates that the legislature has favored disconnection in these circumstances by placing on the district the burden of proving an impairment of its ability to provide fully adequate fire protection. Accordingly, an interpretation of the statute which, in practical effect, forecloses the possibility of disconnection is contrary to the clear intent of the statute. A disconnection by operation of law is to be prohibited when it will result in a material impairment of the fire district's ability to render fully adequate fire protection.

In every disconnection by operation of law there will be a decrease in tax base valuation resulting in a loss of tax revenue to the district. This loss of revenue, however, has no significance to the disconnection unless it is such as to impair the fire district's ability to render "fully adequate" fire protection. The legislature clearly could not have intended to preclude disconnection by operation of law, because the loss in revenue would impair the required standard of fire protection when the district is not levying at the maximum tax rate. The legislature was aware that the financial loss resulting from a disconnection might necessitate a tax increase, and it certainly was not its intent to defeat a disconnection in order to avoid a tax increase. See *Trustees of Schools v. School Directors*, 190 Ill. 390; *School Directors v. Wolever*, 26 Ill.2d. 264.

In the present case, at the time the amended petition was filed section 14 of the Act provided that the maximum tax rate could be increased to .40% by referendum. (Ill. Rev. Stat. 1971, ch. 127½, par. 34.) Karl Biallas testified that the District was levying taxes at only a .30% rate. Additionally, section 22 authorized a fire

district to furnish ambulance service when approved by referendum, and to levy a tax rate not to exceed .25% to finance this service. (Ill. Rev. Stat. 1971, ch. 127½, par. 38.5.) The record indicates that the District operates such a service, although it is termed a "rescue squad." It is unclear from the record whether or not this service was approved by referendum, thereby permitting the District to collect the tax. We believe the present situation is analogous to those cases involving disconnection proceedings in regard to school districts, which held that the failure or refusal of the electorate to approve a referendum to provide needed revenue is not determinative in a disconnection proceeding. *Trustees of Schools v. School Directors,* 190 Ill. 390, 393; *Community Consolidated School District No. 201 v. County Board of School Trustees,* 7 Ill. App. 2d 98, 102; *Community Unit School District No. 6 v. County Board of School Trustees,* 9 Ill. App. 2d 116, 126, appeal denied, 8 Ill.2d 631.

Reviewing the testimony presented, we find the opinion expressed by Robert Rasch, the District fire chief, as to the impairment of the District's ability to render the required standard of fire protection following the disconnection was totally unsupported by evidence. He had no knowledge of the financial operations of the District except for the amount of salaries paid. Emil Valovic's opinion of the equipment and manpower needs of the District was based upon his survey of the entire District, rather than the area remaining after disconnection. Karl Biallas testified that even if the Village area is disconnected the operational expenses would remain constant, because they are "fixed expenses." It is apparent that this belief was part, if not the entire basis, of his opinion that the District would be impaired by the disconnection. His opinion, therefore, is lacking in credibility. It is difficult to conceive how operating expenses, such as fuel for fire trucks, salaries for paid-on-call volunteer firemen, and similar items will not be lessened by a reduction of 30-35%

of the District's area and 22% of the District's alarms.

Edward Benjamin, a financial consultant to municipalities, testified that he reviewed the assessed valuation of the District and its financial report. He specifically criticized the fallacy of the District's accounting procedures which classified capital expenditures as operating expenses. Considering the expenditures the District was obligated to incur in order to maintain fully adequate fire protection, he stated that the loss of tax revenue resulting from the disconnection would not financially impair the District's ability to continue its present level of operations and to retire its debts. While there were certain factors which would discount the weight of Boyd Hartley's testimony, he did express the obvious fact that the need for fire protection in the District would be less following the disconnection.

We note that the financial information upon which the District premised its arguments was based upon the 1972-1973 fiscal year, and the exhibits contained in the record indicate that appropriations for this fiscal year for items such as heat, utilities, water, and office supplies were 100%, and in some instances 200%, increases over the disbursements for the same items in the 3 previous fiscal years. Moreover, from the time the petition was filed the District was aware of the possibility that the petition might be dismissed and the Village area disconnected. Nevertheless, the District incurred nonbonded indebtedness substantially after the filing of this action, knowing full well that section 20 provided that the disconnected territory would be liable for its proportionate share of only bonded indebtedness. Reviewing the record it is apparent that the District has failed to meet its burden of proving the disconnection will impair its ability to render fully adequate fire protection to the territory remaining after disconnection. This opinion is not to be construed as holding that the loss of 25% of a fire district's revenue may not result in a material impairment of its ability to render

fully adequate fire protection. We merely hold that under the circumstances present in this case the District has failed to establish that this loss will result in a material impairment.

The District argues that section 20 impairs the obligations of contracts because it makes no provision for nonbonded creditors who entered into contracts with the entire District. The record reveals that the District's indebtedness is the result of contracts executed since 1970. Section 20 was enacted by House Bill 105 in 1965. (Ill. Rev. Stat. 1965, ch. 127½, par. 38.3.) The District's argument, therefore, is without merit, since the law was in effect at the time the contracts were executed. "The constitutional provision denying the power to pass any law impairing the obligation of a contract has reference only to a statute enacted after the making of a contract." *People v. Ottman,* 353 Ill. 427, 430; *Chmelik v. Vana,* 31 Ill.2d 272, 281.

Accordingly, the judgment of the appellate court is reversed and the judgment of the circuit court of Cook County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*