*In re* PETITION OF NORTH MAINE FIRE PROTECTION DISTRICT.—
(NORTH MAINE FIRE PROTECTION DISTRICT, Petitioner-Appellee, *v.*
THE CITY OF PARK RIDGE *et al.*, Respondents-Appellants.)

First District (2nd Division)   No. 76-395

Opinion filed May 3, 1977.—Supplemental opinion filed on denial of rehearing
June 28, 1977.

DiLeonardi & O'Brien, Ltd, of Des Plaines (Robert J. DiLeonardi and Robert S. Minetz, of counsel), for appellants.

Wilhelm F. Levander, of Des Plaines, for appellee.

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

The appellee, North Maine Fire Protection District (hereinafter "District"), filed a petition under section 20 of "An Act in relation to fire protection districts" (Ill. Rev. Stat. 1971, ch. 127½, par. 38.3), seeking to prevent the automatic disconnection of certain of its territory (hereinafter called "Ballard Gardens"), which had been annexed by the City of Park Ridge. The appellants are the City of Park Ridge and the property owners of the disputed Ballard Gardens area. Following a hearing on the petition, the court below entered an order granting the petition and finding that the automatic disconnection of Ballard Gardens from the District would not materially impair the District's ability to render fully adequate fire protection services, but that it would cause a portion of the District's territory to become noncontiguous with the remainder. The appellants appeal from the trial court's finding with respect to contiguity. The District has filed a cross appeal from the trial court's findings with respect to material impairment.

On October 2, 1972, the City of Park Ridge annexed an unincorporated area known as Ballard Gardens (area "C" on the following diagram).[1] Previous to the annexation, Ballard Gardens was located within the boundaries of the North Maine Fire Protection District. Under section 20 of "An Act in relation to fire protection districts" (Ill. Rev. Stat. 1971, ch. 127½, par. 38.3), the Ballard Gardens area would have become automatically disconnected from the fire protection district on January 1, 1973, unless a petition to prevent such automatic disconnection was filed by the District within 60 days after the annexation.

The District did file such a petition within the 60-day limit, alleging both that the disconnection of Ballard Gardens would materially impair its ability to provide fully adequate fire protection to the area remaining, and that it would cause a parcel of property within the District to become noncontiguous with the remainder. The following is a rough diagram of so much of the area pertinent to this case:

---

[1] On page 2 is a rough sketch setting forth, so far as pertinent, the territorial boundaries of the City of Park Ridge and the District prior to the instant controversy.

On February 5, 1973, Park Ridge annexed another portion of the fire protection district (area "B") which would become disconnected on January 1, 1974, unless the District filed an objection by way of a petition within the 60-day statutory period. No petition having been filed, area "B" was automatically disconnected from the District on January 1, 1974.

The hearing on the District's petition to prevent automatic disconnection of Ballard Gardens began on December 26, 1973. A final order was not entered by the trial court until December 30, 1975.

## I. Contiguity

■■ The basis for the appellants' argument is that by the date of the hearing on the District's petition, the tract of land (area "B") which would have made the District noncontiguous had been annexed by the city and had already become automatically disconnected from the District. The appellants contend that the trial court, in considering the issue of contiguity, must assess the facts as they exist on the date of the hearing and final order. We agree. Section 20 of "An Act in relation to fire protection districts" provides, in relevant part:

> "Any territory within a fire protection district that is * * * annexed to a city * * * that provides fire protection for property within such city * * * is, by operation of law, disconnected from the fire

protection district as of January first after such territory is annexed to the city, * * *. Such disconnection by operation of law does not occur if, within sixty days after such annexation * * * the fire protection district files with the appropriate court a petition alleging that such disconnection *will* cause the territory remaining in the district to be noncontiguous or that the loss of assessed valuation by reason of such disconnection *will* impair the ability of the district to render fully adequate fire protection service to the territory remaining with the district. When such a petition is filed, the court shall set it for hearing, * * *. At such hearing, the district has the burden of proving the truth of the allegations in its petition. * * *" (Emphasis added.)

In *Winfield Fire Protection District v. City of Wheaton* (2d Dist. 1975), 29 Ill. App. 3d 630, 332 N.E.2d 43, the Second District of this court interpreted the aforesaid section to require that questions of contiguity and impairment must be based on facts existing at the time of hearing and final disposition. The Winfield District had filed a petition under section 20 in July of 1965, objecting to the automatic disconnection of certain of its territory annexed by the City of Wheaton on grounds that the disconnection would result in noncontiguity of certain geographical areas and would impair its ability to render fully adequate fire protection to the remainder of the district. A hearing was not held on the petition until July of 1973. In the interval, other areas of the District were annexed by the city. The District filed objections to the automatic disconnection of some, but not all, of these areas. When the hearing on the petition was held in 1973, the court consolidated the hearing on the original petition with those filed in the interval, and found that the District had waived the issue of noncontiguity by its failure to file a petition on each and every disconnection.

On appeal, the Winfield District contended that it was error for the trial court to consolidate the petitions for hearing and that the relevant facts for consideration were those existing on the dates on which each petition was filed. The appellate court disagreed, noting that the legislature, in referring to the defenses of noncontiguity and impairment in section 20 used words of futurity ("*will* cause the territory remaining," "*will* impair the ability of the district"), and provided for automatic disconnection after the passage of the specified time, except where a petition is filed within the 60-day limit, in which case the disconnection would not take place until ordered by a court following a hearing. The court stated:

"Since a hearing is contemplated in order to determine whether disconnection should take place and since disconnection does not occur until it is in fact ordered by the court, the facts at the time of the hearing and final disposition must control the court's decision.

This interpretation is in accord with the usual holdings in other disconnection proceedings where it has been concluded that the determination of whether certain territory may be deemed disconnected from a city must be based on the state of facts existing at the time of the hearing rather than at the time the petition to disconnect was filed. [Citations.]" 29 Ill. App. 3d 630, 633.

In the case at bar, when the District filed its petition to prevent automatic disconnection in November of 1972, it effectively prevented the disconnection of Ballard Gardens on January 1, 1973. When the petition was finally heard in 1974, intervening events had made impossible the District's burden of proving that the disconnection "will" cause the territory remaining in the District to be noncontiguous.

It is a cardinal rule in Illinois that a statute should be construed so as to ascertain and give effect to the intention of the General Assembly expressed in the statute. (*People ex rel. Kucharski v. Adams* (1971), 48 Ill. 2d 540, 543, 273 N.E.2d 7.) To apply this rule, the court may look to the object or purpose to be attained by a statute. *People v. Dednam* (1973), 55 Ill. 2d 565, 568, 304 N.E.2d 627.

■■■ In our opinion, the intent of the legislature in enacting section 20 was to eliminate a situation which resulted in double taxation for fire protection services levied on property owners whose property, formerly within the boundaries of a fire protection district, was annexed by a municipality. Formerly, the only remedy available was under section 11b (Ill. Rev. Stat. 1971, ch. 127½, par. 31b; see *People ex rel. Kelly v. Lund* (1962), 25 Ill. 2d 387, 185 N.E.2d 174). The intent of the legislature was to favor disconnection by making it automatic, and requiring the fire protection district to initiate any action to prevent disconnection and to bear the burden of proof. In addition, the legislature expressed its intent that although it favored disconnection, in doing so it did not advocate the creation of noncontiguous territories within a fire protection district.

The District argues that the appellants have incorrectly interpreted the *Winfield* decision and urges this court to apply the rule as stated in *Wood Dale Public Library District v. Village of Itasca* (2d Dist. 1974), 22 Ill. App. 3d 922, 317 N.E.2d 107. In *Wood Dale*, decided prior to *Winfield*, the Second District interpreted similar language contained in section 2—9a of the Illinois Public Library District Act (Ill. Rev. Stat. 1969, ch. 81, par. 1002—9.1). The court stated that the words of futurity used in the statute mean "as soon as disconnection occurs." (22 Ill. App. 3d 922, 928.) The District argues that the court's position in *Wood Dale* should be followed because it "is based on sounder ground" than the *Winfield* interpretation. However, the clarification of this ambiguity was the very issue of the *Winfield* case where the same court stated, in unambiguous

terms, that the facts to be considered in assessing the issues of contiguity and impairment are those existing at the time of the hearing and final disposition of the petition. (22 Ill. App. 3d 630, 633.) It is clear that *Winfield* is a refinement of *Wood Dale* and that the rule of the latter is incomplete without consideration of the modification of the former.

The territorial boundary lines of cities, villages, and other units of local government frequently change. This is especially true in a large portion of suburban Cook County. It would be unrealistic to close our eyes to boundary changes and describe an area as either contiguous or noncontiguous because we refuse to consider in cases such as these the actual conditions existing at the time of the hearing. We therefore hold that the trial court was in error on the issue of contiguity.

## II. Material Impairment

A more difficult question is presented by the District's cross appeal challenging the trial court's finding that the loss of assessed valuation to the District by the disconnection of Ballard Gardens would not materially impair the District's ability to render "fully adequate" fire protection services. Both sides concede, and the testimony contained in the record confirms, that the District at the time of the hearing did not provide "fully adequate" service. The District argues that it could not have been the intent of the legislature, in enacting section 20, to allow an inadequate fire protection district to become still more inadequate as the result of the disconnection of a part of its territory. The appellants argue that section 20 provides protection only to those fire protection districts which already provide "fully adequate" service and which would be materially impaired by the disconnection.

The statutory language, "impair the ability of the district to provide fully adequate fire protection service," was interpreted by this court in *In re Roberts Park Fire Protection District* (1st Dist. 1974), 20 Ill. App. 3d 282, 314 N.E.2d 208, and, on appeal, by our supreme court at 61 Ill. 2d 429, 337 N.E.2d 8. This court interpreted the language as demonstrating a strong legislative policy in favor of the protection of human lives and property from destruction and devastation by fire, and thus prohibiting the disconnection of territory from a fire protection district if it would result in *any* impairment of the ability of the district to maintain the high standard of "fully adequate" fire protection services. (20 Ill. App. 3d 282, 288.) In reversing this court, the supreme court interpreted the language as demonstrating a legislative policy favoring disconnection by placing on the district the burden of proving an impairment of its ability to provide fully adequate fire protection services. (61 Ill. 2d 429, 438.) The court reasoned that the "any impairment" test established by this court would effectively frustrate the legislative purpose, and held that it was the

burden of the district to prove a *material* impairment of its ability to provide "fully adequate" fire protection services. (61 Ill. 2d 429, 438.) In addition, the supreme court stated:

> "In every disconnection by operation of law there will be a decrease in tax base valuation resulting in a loss of tax revenue to the district. This loss of revenue, however, has no significance to the disconnection unless it is such as to impair the fire district's ability to render 'fully adequate' fire protection." 61 Ill. 2d 429, 438.

The supreme court held that there was no material impairment of the ability of the Roberts Park fire district to provide fully adequate fire protection to the remainder of the district following disconnection, even though the area to be disconnected contributed 24 or 25 percent of the district's total revenue.[2] Three significant factors were considered by the court: (1) the Roberts Park fire district was not levying at the maximum rate allowed by law, and had failed to utilize other authorized sources of revenue, such as its bonding powers; (2) the evidence indicated that the need for fire protection in the district would decrease following the disconnection; and (3) sufficient revenue could be generated by a tax increase and utilization of other sources of funding to allow the district to continue to function.

In the case at bar, the District has argued that the opposite of these three factors exist: that the District is currently levying its tax at the maximum rate allowed by law; that there would be no decrease in the fire protection requirements of the area remaining within the District following the disconnection; and that the resulting loss of revenue would require the District to lay off at least one of its firemen, thus reducing the adequacy of already inadequate services.

The testimony at the hearing on the District's petition consisted of the expert testimony of Dale Moore, Chief of the North Maine District Fire Department, Boyd Hartley, an associate professor of fire and safety engineering at the Illinois Institute of Technology, and Richard H. Soloman, a consulting engineer specializing in the field of fire protection engineering.

Chief Moore testified to the general characteristics of the District and of the North Maine Fire Department, and as an expert in the field of fire safety. He stated that the fire department has the following equipment: one fire station, three pumper trucks, an aerial truck, a station wagon used as an "emergency vehicle," and a fire chief's car. It employs a fire chief, 13 full-time firemen, a radio operator, and 30 paid on-call firemen. Prior to

---

[2] The court did state, however, that: "This opinion is not to be construed as holding that the loss of 25 per cent of a fire district's revenue may not result in a material impairment of its ability to render fully adequate fire protection. We merely hold that under the circumstances present in this case the District has failed to establish that this loss will result in a material impairment." 61 Ill. 2d 429, 440.

the creation of the fire department, the District received a rating of eight on a scale of one (highest) to ten (lowest) from the Insurance Services Office, an organization which rates fire districts and fire departments for insurance purposes. In 1973, the District received an improved rating of six, while the fire department was rated at five. The District contains approximately 6½ square miles and a population of 28,000 to 30,000. It is approximately 80 percent residential, 15 percent commercial, and 5 percent industrial. On direct examination, Chief Moore testified that there was some minor new construction in the District, but that there was little undeveloped land within the District. On cross-examination, however, he testified that approximately 20 acres of land at the corner of Ballard and Potter Roads, within the District, was then under development as condominiums. He also stated that another 40 or 45 acres west of Potter Road were undergoing similar development.

Chief Moore testified that the emergency vehicle service provided by the District, while in many respects similar to an ambulance service, was not an ambulance service. He conceded that a fire protection district can operate an ambulance service under State law only if approved by a referendum and funded by a separate tax levy. (Ill. Rev. Stat. 1973, ch. 127½, par. 38.5.) Such a referendum was defeated by the voters in the District during 1973.

As an expert in his field with more than 26 years experience, Chief Moore stated his opinion that the District is "woefully" undermanned and underequipped. In addition, he believes that the disconnection of Ballard Gardens will not affect the needs of the remainder of the District for fire protection services, but that the loss of revenue would require the termination of at least one fireman, thereby reducing the ability of the fire district to satisfy those needs. As to the ultimate question, Chief Moore testified that in his opinion, the loss of one fireman would impair the ability of the District to provide fully adequate fire protection.[3]

Boyd Hartley, an expert testifying for the District, stated that the disconnection of Ballard Gardens from the District would not reduce the need for firemen or equipment, and would impair the ability of the District to provide fully adequate services. His opinion was based on his examination of the District, his discussions with Chief Moore, and his examination of the exhibits filed in this case; and that in reaching his conclusions, he had assumed that the assessed valuation of the District would increase slightly in 1973, thus generating slightly higher revenues in 1974. Despite the increase in revenues, he believed that the District, with

---

[3] It is to be noted that the District levies for so-called "call back" compensation. At oral argument before this court, it was acknowledged that this is used to pay for regular employees who are called back for service, as well as "volunteers" who are regularly used by the District.

the disconnection, would not have enough funds to provide even the current level of service to the remainder of the District.

Richard H. Soloman testified as an expert witness for the appellants. He testified that the District has never provided "fully adequate" services in the past, is not presently providing "fully adequate" services, and will not be able to do so after the disconnection; that he could not say what he would consider a fully adequate level of services, but that it would be a higher level of service than merely "adequate" services. He also testified that he knew of no fire departments which he would characterize as providing "fully adequate services." .

The documentary evidence indicates that in 1972 (the only year for which complete figures are contained in the record), the equalized assessed valuation of the entire North Maine Fire Protection District was $71.858 million, a 2.3 percent increase over 1971. In 1972, the District levied at the maximum rate provided by statute of .40 percent. (Ill. Rev. Stat. 1971, ch. 127½, par. 34.) The total corporate fund levy amounted to $326,889. As of December 15, 1973, total expenditures amounted to only $231,965.60. Thus, as of December 15, 1973, the District had an unexpended balance of approximately $95,000.

The assessed valuation of Ballard Gardens in 1972 was $2.845 million, approximately four percent of the total assessed valuation of the District. Of the total tax collections for the District's corporate fund of $283,044 received during 1973, four percent, or $11,381, is attributable to Ballard Gardens.

The trial court found that the loss of revenue resulting from the disconnection of Ballard Gardens, although it would in all likelihood result in the loss of the services of one fireman, would not materially impair the District's ability to provide fully adequate fire protection services to the remainder because the District was rendering service for "matters other than fire protection, * * * a service that is not permitted to be funded by the general fund of a Fire Protection District," an obvious reference to the District's "emergency vehicle" service. On review, we may not disturb these findings unless we are satisfied that they are against the manifest weight of the evidence. (*Winfield Fire Protection District v. City of Wheaton* (2d Dist. 1975), 29 Ill. App. 3d 630, 636, 332 N.E.2d 43; *Wood Dale Public Library District v. Village of Itasca* (2d Dist. 1974), 22 Ill. App. 3d 922, 930, 317 N.E.2d 107.) The trial judge had an opportunity which we lack to observe the conduct of the witnesses and to determine their credibility. *In re Roberts Park Fire Protection District* (1st Dist. 1974), 20 Ill. App. 3d 282, 290, 314 N.E.2d 208.

■■■ The conclusions reached by the trial judge are not contrary to the manifest weight of the evidence, especially when compared with the

24- or 25-percent loss of assessed valuation held not to be material in the supreme court's decision in *Roberts Park*. Here, the loss of assessed valuation amounts to only four percent of the total. We do not say this comparison is a conclusive test, only that this along with the following factors supports the trial court's finding. The District is operating a "rescue vehicle" service which is virtually indistinguishable from an ambulance service, and for which the voters in the District defeated a referendum to provide authorization and funding. It is significant to note that in 1972, of the 687 alarms, 330 were for emergency calls for heart attacks, drug overdoses, automobile accidents, and other non-fire-protection services. It is obvious the District should re-evaluate the question of continuing such services when considering the effect of the instant disconnections. In addition, we may take judicial notice of the increasing value of real estate in suburban Cook County, the new construction within the District as indicated by the record, and the corresponding increase in assessed valuations which should result therefrom. (See *People ex rel. DuPage County v. Smith* (1961), 21 Ill. 2d 572, 579, 173 N.E.2d 485; *Ashland Savings & Loan Association v. Aetna Insurance Co.* (1st Dist. 1974), 18 Ill. App. 3d 70, 77-78, 309 N.E.2d 293.) This should diminish the impact of the loss of revenue from Ballard Gardens.

Accordingly, the decision of the circuit court of Cook County is reversed as to the issue of contiguity, and affirmed as to the issue of material impairment.

Affirmed in part; reversed in part.

STAMOS and PERLIN, JJ., concur.

### SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

Petitioner has requested a rehearing in the above-entitled cause on the basis that the evidence upon which this court concluded there would be no material impairment of the fire district's ability to render fully adequate fire protection services after disconnection of Ballard Gardens was not current to the date of the final disposition of the petition on December 30, 1975. Petitioner contends that the only evidence before this court on the issue of material impairment was the expert testimony taken at the hearing conducted on December 26, 1973, two years previous to the final disposition of the petition by the trial court.

■■ We agree with the petitioner that, as with the issue of contiguity,

questions of impairment must be determined as of the date of the hearing and final disposition of the petition by the trial court. (*Winfield Fire Protection District v. City of Wheaton* (2d Dist. 1975), 29 Ill. App. 3d 630, 633, 332 N.E.2d 43.) We also believe that this requirement has been fully met in the instant case. It is true that all of the oral testimony was heard by the trial court on December 26, 1973. But the hearing was then continued to November 19, 1974, when the parties submitted additional proofs in the form of documentary evidence. On December 11, 1974, the court heard arguments by counsel and again continued the hearing. On December 15, 1975, the court heard arguments by counsel relating to the effect of the supreme court's then recent decision in *In re Roberts Park Fire Protection District* (1975), 61 Ill. 2d 429, 337 N.E.2d 8. Thus, the hearing on the petition was not actually concluded until 15 days prior to the final disposition of the petition by the trial court. The record in the case remained open for the entire two-year period over which the hearing was conducted. Counsel for the petitioner had an obligation to bring any new evidence before the court during that time. Having failed to do so, he will not be heard to complain.

We note the petitioner's contention that if additional hearings were to be held, the evidence would show that voters in the district on March 30, 1974, passed a referendum authorizing a separate additional tax levy for ambulance service. We do not understand why petitioner did not petition the trial court to consider this evidence while the hearing was in progress. Far from demonstrating an additional impairment of the district's ability to render fully adequate fire protection services, such evidence could suggest an improved financial picture for the district.

We find no merit in the other points raised in the petition for rehearing.

Petition for rehearing denied.

STAMOS and PERLIN, JJ., concur.