In re DISCONNECTION OF CERTAIN TERRITORY FROM THE SANITARY DISTRICT OF ROCKFORD. (Catherine N. Elden et al., Petitioners-Appellees, v. The Sanitary District of Rockford, Respondent-Appellant.)

Second District    No. 82—299

Opinion filed December 10, 1982.

John B. Roseberg and H. Emmett Folgate, both of Reno, Zahm, Folgate, Lindberg & Powell, of Rockford, for appellant.

Michael F. O'Brien, of Paddock, McGreevy & Johnson, of Rockford, for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:

The Sanitary District of Rockford, Illinois (hereinafter the District), appeals an order of the circuit court of Winnebago County approving disconnection of the Panorama Valley Tract from the District, as well as the trial court's earlier order permitting an election regarding disconnection. The petitioners are voters of the Panorama Valley and Holiday Subdivisions in Winnebago County. The disconnection proceedings were brought pursuant to section 24 of the Sanitary District Act of 1917 (Ill. Rev. Stat. 1981, ch. 42, par. 317f). The issues presented for review are whether there was an existing improvement or an authorized improvement within the meaning of section 24 that should have precluded the election for disconnection.

The facts are not in dispute. In August 1979, a year and one-half before the annexation of the Panorama Valley Tract to the District, the District built an 18-inch interceptor sewer outside its boundaries

that extended under 12 of the 268 lots in the Panorama Valley Tract. The sewer was built with Federal funds and bond revenues, not financed by special assessment, and was one of several built outside the District's boundaries to serve outlying areas expected to need sewer service within five years. On February 6, 1981, petitions were filed by more than 60% of the property owners in the Panorama Valley Tract, seeking that the District annex the tract and sewer it by means of special assessment. The area was annexed to the District in March 1981. It comprised parts of three subdivisions and some adjacent unplatted tracts of land. Following a public hearing, the District on July 20, 1981, enacted Ordinance No. 383, providing for the construction of sewers in the territory to be paid for by special assessment and directing its attorney to petition the court to levy a special assessment. On August 14, 1981, a petition signed by approximately half of the registered voters in the Panorama Valley Tract was filed in the circuit court, seeking an election to disconnect that area from the District. The District opposed the election on grounds that the petitioners could not satisfy the statutory prerequisites for the ordering of a disconnection election. At the time of the hearing on the petition, the sewer that was installed prior to annexation was not being used for sewage. On August 19, 1981, five days after the petition for disconnection was filed, the District filed a petition to levy the special assessment. Those proceedings were stayed pending resolution of this action. Hearings were held on September 22 and 30, 1981. The trial court found that there was no existing or authorized improvement, within the meaning of the statute, that would preclude a disconnection election and ordered an election. The election was held November 3, 1981, and disconnection was favored by a margin of 269 to 142. On the trial court's order, the District board of trustees passed an ordinance of disconnection, which was approved by the court's order and filed August 16, 1982, disconnecting the territory. The District appealed.

The first issue presented is whether the District's enactment of the special assessment ordinance amounted to the authorization of the improvement under section 24 of the Sanitary District Act of 1917, so as to preclude a disconnection election, when at the time the election was asked for the District had not petitioned the court to levy the special assessment.

Section 24 provides a means for disconnecting territory from a sanitary district. The procedure is initiated by a voters' petition to the circuit court for an election on the question of disconnection. Besides describing the boundaries of the territory, the petition must recite the

following:

(1) "that there is no bonded indebtedness of such sanitary district incurred while such territory was a part of such sanitary district";

(2) "that no special assessments for local improvements were levied upon or assessed against any of the lands within such territory or if so levied or assessed, that all of such assessments have been fully paid and discharged"; and

(3) "that *such territory is not,* at the time of the filing of such petition, *and will not be, either benefited or served by any work or improvements either then existing or then authorized by said sanitary district.*" (Emphasis added.) Ill. Rev. Stat. 1981, ch. 42, par. 317f.

The ordinance in question in the instant case, No. 383, purported to provide for local improvements—the sewering of parts of the Panorama Valley Tract—to be paid for by special assessment. It provided that the sewers be constructed in accordance with the official specifications prepared by the District's engineering department and adopted by the board of trustees. The cost of the improvement was estimated to be $1,223,000, and there were provisions for the plan of payment of the special assessment. The District's attorney was directed to file in the circuit court a petition to levy the special assessment. The ordinance was "to take effect and be in force from and after its passage and approval."

The District contends that the passage of Ordinance No. 383 was the authorization of an improvement within the meaning of section 24. It relies on the rule of statutory construction that the ordinary and popularly understood meanings of statutory terms presumably apply unless the legislature provides otherwise. (*La Salle National Bank v. Village of Burr Ridge* (1967), 81 Ill. App. 2d 209, 217, *appeal denied* (1967), 36 Ill. 2d 631.) According to the District, the dictionary meaning of "authorized" buttresses its position that the improvement was authorized by the ordinance. The District also urges that the legislature intended to favor retention rather than disconnection of territory in that the statute puts the burden on the petitioners to demonstrate that there is no bonded indebtedness, levied special assessment, or existing or authorized improvements. This, the District believes, reflects an intent to permit disconnection only in limited cases, when property is merely burdened by taxation and should not have been in the sanitary district in the first place, and not when an area is about to incur some benefit by its presence in the sanitary district.

The petitioners also address the questions of statutory construc-

tion and legislative intent. They argue that to construe the ordinance's initial passage as authorizing the improvement would render as meaningless surplusage section 24's specific provision for special assessments. The petitioners contend that the statute should be liberally construed to facilitate disconnection, citing cases construing other disconnection statutes with different terms. They attribute to the legislature an intent to prevent disconnection only when a sanitary district has assumed actual obligations in reliance on a territory's continued status as part of the district. According to the petitioners, the passage of the special assessment was simply an early step in the multi-stepped procedure for making local improvements and was preliminary to authorization.

■ There is really no question that the sewers being contemplated amount to an improvement. The inquiry is whether they were "authorized." The cardinal rule of statutory construction is that the courts give effect to the intention of the legislature as expressed in the statute. (*Young v. Mikva* (1977), 66 Ill. 2d 579, 583.) In determining legislative intent, the court should construe the statute in its entirety. (*Jahn v. City of Woodstock* (1981), 99 Ill. App. 3d 206, 209.) Article 9, division 2, of the Illinois Municipal Code (Ill. Rev. Stat. 1981, ch. 24, par. 9—2—1 *et seq.*) governs the procedure for making local improvements by special assessment and is applied to sanitary districts by section 19 of the Sanitary District Act of 1917 (Ill. Rev. Stat. 1981, ch. 42, par. 317a). It should be considered with chapter 42 in determining whether Ordinance No. 383 "authorized" the improvement. A municipality may provide by ordinance for the making of any local improvement by special assessment (Ill. Rev. Stat. 1981, ch. 24, par. 9—2—5) and must adequately describe the improvement (Ill. Rev. Stat. 1981, ch. 24, par. 9—2—9), hold public hearings (Ill. Rev. Stat. 1981, ch. 24, par. 9—2—10), and estimate the cost of the improvement (Ill. Rev. Stat. 1981, ch. 24, par. 9—2—12). If the ordinance passes, an officer of the municipality petitions the circuit court to levy an assessment for the improvement in accordance with the ordinance (Ill. Rev. Stat. 1981, ch. 24, par. 9—2—43). After an ordinance has been adopted and before it is confirmed in court, the corporate authorities may abandon any portion of the proposed improvement (Ill. Rev. Stat. 1981, ch. 24, pars. 9—2—6, 9—2—61). The court determines the sufficiency of the proceedings and whether there is an equitable and just distribution of the cost of the improvement among the properties benefited (Ill. Rev. Stat. 1981, ch. 24, pars. 9—2—56, 9—2—57). The judgment of the court levying a special assessment is a lien on the property assessed, on behalf of the municipality, but the municipality may

later have the court's order vacated if no contract is let or if the making of the improvement is never commenced or is abandoned (Ill. Rev. Stat. 1981, ch. 24, par. 9—2—65).

Thus, a special assessment is not finalized until it has been reviewed by the court and levied. Arrangements to make the improvement itself are finalized even later. The time for entertaining bids for contracting the construction of the improvement is within 90 days *after* the judgment of confirmation of the special assessment (Ill. Rev. Stat. 1981, ch. 24, par. 9—2—102), and there is always the possibility that the municipality may abandon the project. The District views the court hearing and confirmation of an assessment roll as simply a measure to insure the proper distribution of cost and benefits among the affected properties, suggesting that the improvement itself is not subject to review. However, the court may invalidate an ordinance if it is unreasonable. *Village of Glencoe v. Jackson* (1968), 102 Ill. App. 2d 65, 74 (clear proof that an improvement is unnecessary will overcome a presumption that an ordinance is valid).

Although the procedure set forth in article 9 lends support to the position that the District had no power to "authorize" at the time it enacted Ordinance No. 383, there is perhaps a clearer indication to the way article 9 characterizes the improvement being sought. Article 9 repeatedly refers to the improvement contemplated by a special assessment ordinance as a "proposed improvement." (See, *e.g.*, Ill. Rev. Stat. 1981, ch. 24, pars. 9—2—6, 9—2—9, 9—2—10, 9—2—12, 9—2—47, 9—2—56, 9—2—61.) Nowhere is the improvement described as "authorized." The District's reference to section 9—2—5 as the "ordinance authorizing improvements" is inaccurate. That title was supplied by the West Publishing Co. and not by the legislature, and its language does not appear in the text of the provision. There is a reference in section 20 of the Sanitary District Act of 1917 (Ill. Rev. Stat. 1981, ch. 42, par. 317b) to the "ordinance *authorizing* such assessment." (Emphasis added.) It could be argued that that language by inference refers also to the improvements, since without a contemplated improvement there is no basis for a special assessment. However, the ordinary meanings of the words "authorized" and "proposed" support the petitioners' position rather than the District's. "Authorized" means "given or endowed with authority" ("authority" is defined as "the power to determine, adjudicate, or otherwise settle issues or disputes; *** the right to control, command or determine") or "legally or duly sanctioned." "Propose" means "to offer or suggest *** for consideration, acceptance or action." (Random House Dictionary of the English Language 100, 1153 (1967).) It is not clear

that the District had any power, prior to the court's final judgment, to make an improvement, since the ordinance could be overturned and there was no power to contract for the work. Therefore, it could not firmly "authorize" one.

Section 24 does refer to authorization of an improvement by the sanitary district rather than by the court, but it does not necessarily follow that the passage of Ordinance No. 383 was such an authorization. The necessity of a local improvement is a legislative determination within the ambit of the municipality. (*In re Special Assessment for Construction of Sidewalks* (1973), 10 Ill. App. 3d 243, 246.) However, here it is subject to mandatory review by the court before any action may be taken. That seems to be the point at which a sanitary district may finally authorize an improvement to be built. Prior to that, it has determined a need for the improvement and proposed an improvement to meet that need.

The District argues that the statute was meant to preclude disconnection when an improvement was imminent and believes that Ordinance No. 383 would impose such a restriction. However, not only could the District change its mind and abandon the improvement, but there is no statutory time limit by which it must seek court approval. Thus, even if this was indeed a purpose of the legislature, in the present case the improvement was not imminent, as the District could indefinitely delay pursuing it. Even Ordinance No. 383 itself provides that it will "take effect and be in force from and after its passage *and* approval." (Emphasis added.)

When a word or phrase used in a statute becomes an issue, its strict meaning is not as important as the sense in which it was used by the law-making body. (*City of East St. Louis v. Union Electric Co.* (1967), 37 Ill. 2d 537, *cert. denied* (1968), 390 U.S. 948, 19 L. Ed. 2d 1136, 88 S. Ct. 1034.) The provisions of section 24 give several indications of what the legislature intended to accomplish. One purpose is to protect a sanitary district that has made commitments or incurred obligations for the benefit of the territory—when it has authorized improvements or when a bonded indebtedness exists. In the present case, the District bore the expense of preparing the ordinance, including specifications and cost estimates, but that was incurred without any assurance that the ordinance would pass and is preliminary to committing that the work be done. Another objective of section 24 is to prevent territory for which the District has completed projects from then withdrawing from the District—when there exists work or improvements which currently or prospectively serve or benefit the area. The legislature also wanted to preclude disconnection when pro-

ceedings for local improvement by special assessment reach a certain stage—when the special assessment is levied. Since the legislature included this specific provision for special assessments, it seems unlikely that it contemplated that an earlier stage in the special assessment proceedings should preclude an election concerning disconnection. As the petitioners propose, such an interpretation would make the specific special assessment provisions superfluous, which is to be avoided if logically possible. (See *Patteson v. City of Peoria* (1944), 386 Ill. 460, 463.) To find that Ordinance No. 383 did not, prior to court approval, preclude the election, however, would give effect to all the provisions, since the "authorized improvement" language is broad enough to include improvements financed by means other than special assessments.

■ The most obvious and basic purpose of section 24 is to provide a means of disconnection from a sanitary district when the enumerated restrictions have been satisfied. In view of the guidelines for statutory construction, the apparent intention of the legislature, the characterization of the improvement as proposed rather than authorized, the lack of commitment by the District at that point, and its ability to change its mind, the trial court was correct in certifying the disconnection election notwithstanding Ordinance No. 383.

The second issue raised is whether a nonfunctioning interceptor sewer is an "existing" improvement under section 24 of the Sanitary District Act of 1917, so as to preclude a disconnection election, when the interceptor was constructed to serve an area outside the District prior to the territory's annexation and extended under only a small portion of that territory.

■ As already noted, section 24 precludes an election for disconnection if there is an existing improvement that either serves or benefits the territory or will serve or benefit it. The District contends that an 18-inch gravity flow interceptor sewer that extends under 12 of the 268 lots of the territory and was built by the District should have barred the election. The District acknowledges that the sewer was installed before the territory was annexed to the District and that it had not yet been hooked up and was not functioning. However, the District argues that under the language of section 24 it is an existing sewer that will benefit and serve the territory when it is connected to the sewer proposed in Ordinance No. 383.

The petitioners present several arguments to rebut the District's position. They note that the sewer was built with Federal funds before the territory was annexed and was not built specifically to serve the territory. They argue that this sewer should not be given the sta-

tus of an existing improvement that would bar disconnection because such an interpretation is not consistent with a liberal construction of disconnection statutes. Since the sewer was completed before annexation of the territory, they contend that this is not an instance of a sanitary district's injurious reliance upon the inclusion of territory and so would not contravene the legislators' intent to protect a sanitary district in such a circumstance. The petitioners further argue that there is no assurance that the interceptor will ever benefit or serve the territory, since the special assessment through which the proposed connecting sewer would be financed has not been levied and the contemplated improvement might never be constructed. They suggest that the District's position, if adopted, could be extended to the District's sewage treatment facilities and interceptor system, which can potentially benefit any outlying area, and would foreclose the possibility of disconnection. Finally, even if the sewer did fall within section 24's meaning, it should at the most preclude disconnection of only the small portion of the territory under which the sewer extends.

▪ The petitioners' arguments are persuasive. To hold that the previously constructed sewer bars disconnection would make annexation irrevocable at the outset. Given the reasons behind the legislature's imposition of the three restrictions on petitioning for disconnection, which we have discussed, it is unlikely that the legislature intended the rigid application proposed by the District. Such an interpretation would give a sanitary district the ability to lock a territory in permanently, without any chance for disconnection. Although there are no cases construing the section 24 issues presented in the instant case, the courts have liberally construed other disconnection statutes in favor of disconnection. Disconnection is favored whether it happens by operation of law and the burden is on the municipality to show a reason that would preclude disconnection (*In re Roberts Park Fire Protection District* (1975), 61 Ill. 2d 429), or is initiated by a petition setting forth the requisite facts to support disconnection (*Sun Electric Corp. v. Village of Prairie Grove* (1978), 59 Ill. App. 3d 608, 612, *appeal denied* (1978), 71 Ill. 2d 615; *In re Disconnection of Certain Territory from the City of Palos Heights* (1961), 30 Ill. App. 2d 336, 342, *appeal denied* (1961), 21 Ill. 2d 622). Although the facts that a petition must recite under section 24 differ from those in statutes that have been construed to favor disconnection, a liberal construction of section 24 in favor of disconnection seems appropriate in light of those cases. The common theme is to permit disconnection absent a hardship or impairment to the municipality. This is in harmony with the apparent intent of section 24. The language of the statute is clear

and unequivocal and is not qualified. However, the court may determine intent from the necessity or reasons of a statute and the meaning of its words, enlarged or restricted according to their real intent. (*In re Roberts Fire Protection District* (1975), 61 Ill. 2d 429, 438.) Courts should be cognizant of the difficulty of drafting legislation that will work smoothly in all situations, some of which might not have occurred to the proponents. (*Childers v. Modglin* (1954), 2 Ill. App. 2d 292, 299.) The District's interpretation of section 24 would make disconnection impossible even in a case where a sanitary district had not changed its position in reliance on a territory's annexation.

The judgment of the circuit court of Winnebago County is affirmed.

Judgment affirmed.

HOPF and NASH, JJ., concur.