*In re* ELK GROVE RURAL FIRE PROTECTION DISTRICT (Elk Grove Rural Fire Protection District, Petitioner-Appellee, v. The City of Des Plaines, Respondent-Appellant).

First District (5th Division)   No. 83—2729

Opinion filed July 18, 1986.

922

Patrick A. Lucansky and Richard T. Wimmer, both of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellant.

Friedman & Koven, of Chicago (Donald J. Kreger and Stephen Fedo, of counsel), for appellee.

JUSTICE PINCHAM delivered the opinion of the court:

Respondent, the city of Des Plaines (Des Plaines), appeals from a ruling of the trial court that disconnection of Waycinden Park from petitioner, the Elk Grove Rural Fire Protection District (District) would materially impair the ability of the District to render fully adequate fire-protection service to the territory remaining in the District. The trial court ordered that Waycinden Park remain part of the District.

In 1982, Des Plaines annexed Waycinden Park, which was part of the Elk Grove Rural Fire Protection District. In turn, the District filed a petition against Des Plaines to prevent the annexation. The District's petition alleged that on August 2, 1982, Des Plaines enacted an ordinance which annexed Waycinden Park, and that the disconnection of Waycinden Park from the District would reduce the assessed valuation of the District to such an extent that the District's ability to render fully adequate fire protection service to the remainder of the District would be materially impaired.

The District's petition was filed pursuant to section 20 of "An Act in relation to fire protection districts" (Ill. Rev. Stat. 1981, ch. 127½, par. 38.3) which provides, in pertinent part:

"Any territory within a fire protection district that is or has been annexed to a city *** that provides fire protection for property within such city *** is, by operation of law, disconnected from the fire protection district *** after such territory is annexed ***. Such disconnection by operation of law does not occur if *** the fire protection district files with the appropriate court a petition alleging that *** the loss of assessed valuation by reason of such disconnection will impair the ability of the district to render fully adequate fire protection service to the territory remaining with the district."

The petition prayed that Waycinden Park remain part of the District.

The trial testimony established that the District did not employ firefighters. All of the District's fire-protection services were provided on a contractual basis, beginning January 1, 1979, by American Emergency Services Corporation (American), a private corporation. The contract required that American also provide ambulance and paramedic service to the District.

James Sheldon, trustee and treasurer of the District, testified for the District. His testimony established that the District's assessed valuation at the time of the annexation was $100,236,674 and that Waycinden Park's assessed valuation was $7,980,426. The District levied taxes at the maximum rate established by referendum, which was 70 cents per $100 assessed value. Forty cents of this assessment was for fire service, and thirty cents was for ambulance service. With Waycinden Park included in the District as a taxable entity, this levy yielded $650,000 in revenue for the District. Sheldon testified that the disconnection of Waycinden Park would cause a revenue loss to the District of approximately $53,000 to $56,000, which would reduce the District's revenue to approximately $595,000 to $600,000. The District's total expenditures for fiscal year 1983 were $686,000, and American was paid $549,300 under its contract with the District. For fiscal year 1984, American was paid $587,000.

Next, Gary Jensen, president of American and fire chief for the District testified that American's contract with the District required that American have two paramedics, two firefighters, an alarm operator, and a shift supervisor on duty at all times. Five full-time firefighters (the initial-response team) were on duty at all times. According to Jensen, $587,000 was necessary to provide the same level of service in 1984 that had been provided to the District in 1983, but the same level of service might possibly be provided for $576,000. Jensen stated that if American was forced to operate on less than $576,000, American would have to lay off two or three full-time firefighters. Such a layoff would result in a reduction of American's initial-response team from five to four people 60% of the time. Jensen said that this would not allow American to provide adequate fire-protection service to the District.

Testifying for Des Plaines, Charles Gedroic, fire chief for Des Plaines, concurred with Jensen that a four-person initial-response team 60% of the time was inadequate. Gedroic stated that a six-person initial-response team would be adequate for the District, that a five-person team would "possibly" be adequate, and that a four-person team would be "marginally adequate." Gedroic defined marginally adequate as "not a situation [you] like to have, but sometimes you

have to put up with, and you are willing to at times." Gedroic said that a four-person initial-response team, two people on an engine, and two people on an ambulance, is adequate for fires involving "unattached structures like cars or garbage cans, but for houses or anything else, more firefighters are necessary."

Edward Benjamin, a municipal consultant, testified next for Des Plaines. Benjamin proposed an alternative financial scheme for the District which he said would allow the District to provide fully adequate fire-protection service despite the annexation of Waycinden Park. Benjamin stated that the District's revenue without Waycinden Park was higher than the District alleged ($645,793 rather than $600,000), because the District had underestimated its total tax revenue and its prospective collection and that additional revenue was available to the District through unexploited statutory tax levies. Benjamin testified further that if American eliminated its profit margin and its employee fringe-benefits costs from its contract with the District, the District would not have to incur these costs and would save money.

Ruling in favor of the District, the trial court found that the loss of assessed valuation due to the disconnection of Waycinden Park from the District would materially impair the District's ability to render fully adequate fire-protection service to the District's remaining territory. The court ordered that Waycinden Park remain part of the District.

On this appeal, Des Plaines contends that the disconnection of Waycinden Park from the District, and the alleged resultant loss of assessed valuation to the District, would not materially impair the District's ability to render fully adequate fire-protection service to the District's remaining area. Des Plaines contends that mere financial impairment to the District is inadequate to prevent Waycinden Park's annexation. Des Plaines relies on *In re Roberts Fire Protection District* (1975), 61 Ill. 2d 429, 337 N.E.2d 8, in support of its position. In *Roberts*, the supreme court determined:

"A disconnection by operation of law is to be prohibited when it will result in a material impairment of the fire district's ability to render fully adequate fire protection.

In every disconnection by operation of law there will be a decrease in tax base valuation resulting in a loss of tax revenue to the district. This loss of revenue, however, has no significance to the disconnection unless it is such as to impair the fire district's ability to render 'fully adequate' fire protection." (61 Ill. 2d 429, 438, 337 N.E.2d 8.)

Thus, according to *Roberts*, the District was required to establish that the disconnection of Waycinden Park would result in a revenue loss that would materially impair the District's ability to render fully adequate fire-protection service to the entire District. The trial court found that the District sustained this burden of proof. There is sufficient evidence in the record to support this finding.

James Sheldon, trustee and treasurer of the District, testified that the disconnection of Waycinden Park would cause the District a $53,000 to $56,000 revenue loss. This testimony was not rebutted. Sheldon testified that this loss would reduce the District's total revenues to approximately $595,000 to $600,000. He testified that this was well below the amount necessary to provide adequate fire-protection service. Under the fire-protection-service contract for fiscal year 1984, American was to receive $587,000, which would have virtually exhausted the District's revenues. By comparison, the District's expenditures for fiscal year 1983 were $686,000. This amount exceeded the revenue available to the District in 1984 if Waycinden Park should be disconnected from the District. Sheldon further testified that the lowest workable budget amount was $640,000, and that the District would have $650,000 in revenue with Waycinden Park included in the District. Without Waycinden Park as part of the District, the maximum revenue available to the District would be $600,000.

Gary Jensen, president of American and fire chief for the District, explained American's budget structure and how the District's revenue losses would affect American's ability to provide fire-protection service. Jensen testified that $576,000 was the lowest amount with which American could provide adequate service. He stated that anything less than that amount would force him to lay off two or three full-time firefighters, which would reduce American's initial-fire-response team from five to four people 60% of the time. He stated that this would not allow adequate fire-protection service. Jensen's opinion was supported by Charles Gedroic, fire chief for Des Plaines. Gedroic said that a four-person initial-fire-response team 60% of the time would not be fully adequate, that a six-person initial-fire-response team would be adequate, a five-person team would "possibly" be adequate, and that a four-person team would be "marginally" adequate.

The only testimony to rebut this evidence was that of municipal consultant Edward Benjamin. Benjamin testified that the District had additional revenue available, and therefore there would not be any impairment to fire-protection service as alleged by the District. The trial court apparently found Benjamin's testimony unpersuasive.

Benjamin first stated that additional revenue was available to

the District through its replacement tax, which he stated had produced $26,000 in fiscal year 1982 and would produce a similar amount for fiscal year 1984. Benjamin acknowledged that he had not reviewed the District's replacement tax collection for fiscal year 1983 and that he did not know if the amount collected for 1983 was more or less than 1982. Benjamin could not predict what amount would be collected from the replacement tax for fiscal year 1984. Additionally, Benjamin acknowledged that he did not consider lost collections, taxes which the District was unable to collect, in his 1982 calculations and in his estimates of prospective collections. In 1982 lost collections totaled $27,061, which negates the $26,000 Benjamin calculated as collectable from the replacement tax.

Because Benjamin failed to consider lost collections in his projections and was uncertain of the amounts collectable from the replacement tax, the trial court properly concluded his testimony failed to support Des Plaines' argument that additional revenue was available to the District.

■ Des Plaines' second argument for reversal is that in *In re Roberts Fire Protection District* (1975), 61 Ill. 2d 429, 337 N.E.2d 8, a 25% loss of revenue to the Roberts Fire Protection District did not materially impair that district's ability to provide fully adequate fire-protection service to its remaining territory. Des Plaines points out that the loss to the District in the case at bar because of Waycinden Park's disconnection from the District is only 8%. In *Roberts*, however, the court held that its opinion was not to be construed as a holding that a loss of 25% of a fire protection district's revenue may not result in material impairment of its ability to render fully adequate fire protection. The court further held that "under the circumstances present in this case the District has failed to establish that a loss would result in material impairment." (61 Ill. 2d 429, 440-41, 337 N.E.2d 8.) *Roberts* did not establish a numerical standard for material impairment. It is apparent from *Roberts* that material impairment is to be determined from the facts and circumstances of each case.

■ Additionally, Des Plaines contends that the District's alleged loss of revenue which resulted from the disconnection of Waycinden Park was "self-created, illusory, and avoidable," and that the District had additional revenue available through other tax levies. Specifically, Des Plaines argues that the District could raise additional revenue pursuant to the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1981, ch. 85, par. 1—101 *et seq.*) and the Illinois Pension Code (Ill. Rev. Stat. 1981, ch. 108½, par. 1—101 *et seq.*). The provision of the Tort Immunity Act on which Des

Plaines relies, section 9—107, states:

> "A local public entity may levy or have levied on its behalf taxes annually upon all taxable property within its territory at a rate that will produce a sum which will be sufficient to pay the cost of *** protecting itself or its employees against liability ***." (Ill. Rev. Stat. 1981, ch. 85, par. 9—107.)

Des Plaines argues that based on this statute, the District is empowered to levy taxes to pay the cost of workers' compensation, liability insurance, and unemployment insurance for employees providing fire-protection service. This section allows a public entity, including fire protection districts, to levy a tax to pay the cost of protecting itself and its employees against liability. Des Plaines' contention is unacceptable for the reason that American is an independent contractor which does not fall within the purview of the statute's definition of employee. The general definitions section of the Act (Ill. Rev. Stat. 1981, ch. 85, par. 1—202) states:

> " 'Employee' includes an officer, member of a board, commission or committee, servant or employee, whether or not compensated, but does not include an independent contractor."

Thus, independent contractors such as American are not considered employees under the statue, and therefore, the provisions of the statute cannot be relied upon to levy a tax for liability insurance, workers' compensation, and unemployment insurance. No additional revenue was available to the District under this statute.

Likewise, no additional revenue was available to the District under the Illinois Pension Code (Ill. Rev. Stat. 1981, ch. 108½, par. 4—118). This statute, in pertinent part, provides:

> "The city council or the Board of Trustees, as the case may be, of the municipality shall annually levy a tax upon all the taxable property of the municipality at the rate on the dollar which will produce an amount which, when added to the deductions from the salaries or wages of firemen and receipts available from all other sources as hereinafter referred to, will equal a sum sufficient to (1) meet the annual actuarial requirements of the pension fund; and (2) provide actuarial reserves for the pensions and benefits to be earned by the firemen during the year ***.
>
> The tax shall be levied and collected in like manner with the general taxes of the municipality, and shall be in addition to all other taxes now or hereafter authorized to be levied upon all property within the municipality, and in addition to the amount authorized to be levied for general purposes ***."

■ Section 4—103 of the Illinois Pension Code (Ill. Rev. Stat. 1981, ch. 108½, par. 4—103) defines a "municipality" as:

"Any city, township, village or incorporated town of not less than 5,000 nor more than 500,000 inhabitants, and any fire protection district having any full-time paid fireman ∗∗∗."

The District does not have a full-time paid fireman, but receives all of its fire protection from American. Therefore, the provisions of the Pension Code are not available to the District to raise revenue.

■ Des Plaines next argues that American's profit margin "should be given no consideration when analyzing the District's revenues and expenses, and that it should be eliminated as a necessary expenditure," and that the fringe-benefits costs paid to American's employees can be eliminated from American's contract with the District. American's profit margin and fringe-benefits costs, like its labor and equipment costs, are expenses the District necessarily incurs because they are factored by American into its contract with the District. Simply stated, this is an ordinary cost of doing business.

■ Des Plaines next argues that the District would have additional tax revenue available after the disconnection of Waycinden Park because the District would collect more taxes than it forecasted. We disagree. Municipal consultant Edward Benjamin testified for Des Plaines that the District's tax-collection rate for 1978 and 1979 was 95%, the collection rate for 1979 and 1980 was 100.1%, and for 1980 and 1981, 99% of the District's taxes were collected. The significance of these rates of collection, however, is diminished by the fact that these figures reflect collection rates over a period of years and not the rate collected in the year the tax was due. Thus, it would not be accurate to say, for example, that the District had a collection rate of 99% for 1980 and 1981. In fact, Benjamin stated that routinely, taxes for one year might not be collected until years after they were due. He further acknowledged that some 1981 and 1982 taxes were in default and were not collected until 1983. Benjamin did not know the amount actually collected in 1982, however partial collection figures for 1982 and 1983 reflected a 73.2% collection rate. We therefore conclude that based on Benjamin's testimony, Des Plaines failed to show that additional tax revenues would be available to the District after the disconnection of Waycinden Park. Des Plaines failed to show that additional revenues were available.

■ Des Plaines next argues that *Winfield Fire Protection District v. City of Wheaton* (1975), 29 Ill. App. 3d 630, 332 N.E.2d 443, allows this court to consider the fact that the District previously permitted the disconnection of 20 parcels of land from the District which

decreased the District's tax revenues. Contrary to Des Plaines' argument, *Winfield* does not allow this court to consider disconnections from the District which are not at issue in the instant cause. The question of material impairment must be based on the facts as they exist at the time of the hearing and final disposition of the case. (29 Ill. App. 3d 630, 633, 332 N.E.2d 443.) In *Winfield*, the court considered the district's failure to object to previous annexations and disconnections of certain parcels of land. However, in that case, unlike the case before us, the district's failure to object to annexations and disconnections was directly in issue at trial. Here, the District did not allege that the prior disconnections contributed to the material impairment of its ability to provide fully adequate fire-protection service. The District alleged only that Des Plaines' annexation of Waycinden Park would result in material impairment. In *Winfield*, the court found that the Winfield Fire Protection District's complained of condition (noncontiguity of certain parcels within the district) was caused directly by the previous disconnections, which resulted from that district's failure to file petitions in opposition to the disconnections. Here, material impairment to the Elk Grove Rural Fire Protection District was not caused by prior disconnections, nor was such an allegation made. The District alleged in its petition that the disconnection of Waycinden Park would result in material impairment. The effect, if any, of prior disconnections was not raised. The District's status was considered as it was at the time of the hearing. The trial court properly found that the disconnection of Waycinden Park would result in material impairment.

█ Des Plaines next contends that *North Maine Fire Protection District v. Village of Niles* (1977), 53 Ill. App. 3d 389, 368 N.E.2d 516, allowed the trial court to consider the fact that a disconnection reduces the territory for which a district must provide fire-protection service. The record indicates that the trial court heard testimony on the issue of whether disconnection of Waycinden Park would reduce the territory the District had to protect. James Sheldon, trustee and treasurer of the District, testified for the District that the loss of Waycinden Park would not permit the District to reduce the equipment or personnel necessary to provide adequate fire protection. Contrary to Des Plaines' contention, testimony was presented at trial on the reduction of territory for which fire-protection service is required.

█ █ Finally, Des Plaines argues that the District's witnesses were of dubious credibility and that their testimony was self-serving. Assessing the credibility of witnesses is a matter solely within the discretion of the trier of fact. It is the province of the trial court when

sitting without a jury to resolve disputed questions of fact and to determine the credibility of the witnesses and the weight given their testimony, and the appellate court will not substitute its judgment thereon unless an opposite conclusion is clearly evident. (*Nemeth v. Banalmi* (1984), 125 Ill. App. 3d 938, 972, 466 N.E.2d 977.) Here, the trial court was in the best position to assess the credibility of the witnesses. Its decision will not be disturbed.

It is our judgment that Des Plaines' remaining contentions do not merit consideration by this court.

For the foregoing reasons, we affirm the ruling of the trial court.

Affirmed.

LORENZ and MURRAY*, JJ., concur.

---

*Justice Mejda heard the oral argument in this case. Following his retirement, Justice Murray was substituted, listened to the tape of the oral argument and read the briefs and record.