THE CITY OF De KALB, Plaintiff-Appellee, v. THE TOWN OF CORTLAND, Defendant-Appellant.

Second District   No. 2—91—0562

Opinion filed August 28, 1992.

T. Jordan Gallagher, of Gallagher, Klein & Brady, of De Kalb, for appellant.

Richard L. Turner, Jr., of Sycamore, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, the Town of Cortland (Town or Cortland), appeals from an order of the circuit court of De Kalb County granting the petition of plaintiff, the City of De Kalb (City or De Kalb), for disconnection of a parcel of land from Cortland. The Town asserts that the trial court erred because De Kalb did not present sufficient evidence to support its petition.

This case originated with a complaint filed by the treasurer/collector and county clerk of De Kalb County (No. 87—MR—74). The county officials sought a declaratory judgment as to whether the Town of Cortland or the City of De Kalb was entitled to recover tax revenues generated by a parcel of real estate located in the county and generally known as the Clara Kern Farm. According to the complaint, the parcel in question, which lay between Cortland and De Kalb, was annexed by Cortland in July 1981 and annexed by De Kalb in October 1986. Both municipalities claimed the right to receive tax revenues from the property.

In September 1989 De Kalb filed a petition for disconnection of the Kern property from Cortland (No. 89—MR—85). That cause was consolidated with the declaratory judgment action, and, in October 1989, De Kalb and Cortland entered into a settlement whereby they agreed, and the court ordered, that the Kern farm lay within Cortland's territorial limits. The order also recited that, since the property was acquired by De Kalb for airport purposes, pursuant to section 11—103—1 et seq. of the Illinois Municipal Code (Ill. Rev. Stat. 1981, ch. 24, par. 11—103—1 et seq.) (a division of the statute pertinent to airports for municipalities of less than 500,000), the Town of Cortland had no authority to control, by zoning or regulatory authority, the means or methods of construction upon or improvements to or the uses of the property, to the extent that the property is used as part of the De Kalb Taylor Municipal Airport for airport and landing field purposes. (See Village of Schiller Park v. City of Chicago (1962), 26 Ill. 2d 278.) The County of De Kalb was then dismissed as a party,

and the case ultimately proceeded to a bench trial on De Kalb's petition for disconnection.

For many years Cortland went quietly about its business as a small rural community lying in a generally southwesterly direction from the City of De Kalb. Unincorporated territory separated the two communities. For the most part the Town had grown up along either side of the Chicago and Northwestern Railroad tracks, following a compact pattern of development which helped to retain a strong neighborhood atmosphere. Toward the end of the 1970's, nearby communities began growing and expanding their boundaries toward Cortland—De Kalb from the west and Sycamore from the north.

In 1978 Cortland annexed a strip of land running northwest from the existing Town, along Loves Road, and a large parcel extending north and east from the Loves Road strip. Over the next 13 years Cortland continued to expand to the north and the west, from time to time annexing various parcels lying between itself and De Kalb or Sycamore. All of the annexations resulted from petitions for annexation by the landowners. By the time of the trial on De Kalb's petition in 1991, Cortland consisted of a southeast section and a northwest section connected by a corridor paralleling Loves Road. (See figure No. 1.) The Clara Kern Farm property is located in the northwest section. See figure No. 1.

The City of De Kalb operates and maintains the De Kalb Taylor Municipal Airport. The east end of the airport, including an existing runway, extended into and partially bisected the Kern property at the time it was annexed by Cortland in 1981. (See figure No. 1.) In 1982, in accordance with a master plan for development of the airport, De Kalb became the owner of the 82-acre Clara Kern Farm. De Kalb now seeks to disconnect about 72 of those acres from Cortland. The portion of the property fronting on Loves Road, which forms part of the corridor connecting the northwest and southeast sections of Cortland, is not included in De Kalb's petition.

■ De Kalb seeks disconnection pursuant to section 7—3—6 of the Illinois Municipal Code (Ill. Rev. Stat. 1989, ch. 24, par. 7—3—6), which provides that owners of land lying within a municipality may have such territory disconnected if the disconnection meets certain requirements. On appeal, Cortland focuses on two of the requirements: if the territory is disconnected "the growth prospects and plan and zoning ordinances *** of such municipality will not be unreasonably disrupted" and "the municipality will not be unduly harmed through loss of tax revenue in the future." (Ill. Rev. Stat. 1989, ch. 24, pars. 7—3—6(4), (6).) The courts have liberally construed disconnection stat-

utes in favor of disconnection when the statutory requirements are met, regardless of the petitioner's purpose, the common theme being to permit disconnection absent hardship or impairment to the municipality. *Harris Trust & Savings Bank v. Village of Barrington Hills* (1989), 133 Ill. 2d 146, 154-55; *Indian Valley Golf Club, Inc. v. Village of Long Grove* (1988), 173 Ill. App. 3d 909, 915; *In re Disconnection of Certain Territory* (1984), 122 Ill. App. 3d 960, 965; *In re Disconnection of Certain Territory from the Sanitary District* (1982), 111 Ill. App. 3d 339, 347.

The burden of proving the statutory elements rests on the party seeking disconnection. (*Village of Barrington Hills*, 133 Ill. 2d at 155.) A trial court finding that the statutory requisites for disconnection were established is not to be disturbed unless it is clearly contrary to the manifest weight of the evidence. (*Anderson v. City of Rolling Meadows* (1956), 10 Ill. 2d 54, 58; *First National Bank v. Village of Mount Prospect* (1990), 197 Ill. App. 3d 855, 859; *Sun Electric Corp. v. Village of Prairie Grove* (1978), 59 Ill. App. 3d 608, 612; *La Salle National Bank v. Village of Burr Ridge* (1967), 81 Ill. App. 2d 209, 214.) The trial court found that De Kalb had met all of the requirements necessary to prevail in this action. Cortland contends that the findings on the two requirements it raises on appeal were against the manifest weight of the evidence and the trial court, therefore, erred in granting the petition for disconnection. We disagree.

Unquestionably, the statute focuses on the effect of disconnection on a municipality's growth prospects and plan and zoning ordinances. However, the legislature called for a showing only that disconnection will not be "unreasonably" disruptive to the municipality. Thus, while the legislature recognized that *any* disconnection may have some disruptive effect, only those that are unreasonably so will be prohibited. (*Village of Barrington Hills*, 133 Ill. 2d at 158.) The evidence presented at trial adequately demonstrated that Cortland's growth, planning and zoning would not be unreasonably disrupted by this disconnection.

Cortland does not dispute that the Kern site is now being used for airport purposes. Nor does it contest that, as long as the property is used for such purposes, the Town cannot regulate it through zoning. Hence, given its present use, the site is going to be an airport regardless of whether it is located in Cortland or De Kalb and regardless of what Cortland's zoning ordinance indicates. Cortland's zoning classification for the site, along with any restrictions on use due to zoning, is irrelevant.

Cortland can neither prohibit or regulate the airport nor restrict the property to any other particular classification. The presence of the airport, in turn, was taken into account in Cortland's planning and zoning decisions for surrounding properties, according to the testimony of David Dockus, a former Cortland zoning administrator. Under these circumstances it is difficult to see how disconnection could disrupt the Town's zoning ordinance. On the contrary, it appears that disconnection would have no effect at all either on the site itself or on the use of adjoining parcels located in Cortland.

Much the same argument applies to any planning ordinance Cortland may have. Cortland produced evidence to show that the primary thrust of its plan is to maintain the residential identity of the Town. To achieve this end its plan provided for the creation of a high density residential buffer zone, located on the Kern site but in the perimeter around the airport runway. This zone would shield the nearby low density residential areas from the airport noise and aviation activity. However, completely aside from any plan developed by Cortland, once De Kalb acquired the property and began using it for airport purposes, Cortland was powerless to control its development through zoning or to conform its use to the Town plan. Cortland could do nothing to bring about the particular buffer zone addressed in its plan, since it was proposed to be located on what is now the site of the airport.

Cortland suggests that De Kalb may at some time in the future put the property, or at least portions thereof, to other uses which would be incompatible with the zoning classifications on surrounding parcels located within Cortland. As we have said in the past, we will not speculate regarding future events. It is the state of affairs at the time of the hearing which controls, not the factual situation a litigant might desire. *Indian Valley Golf Club, Inc. v. Village of Long Grove* (1988), 173 Ill. App. 3d 909, 919.

The trial exhibits show that the Kern land is contiguous to Cortland on only two sides and is the site of a municipal airport. Ronald Naylor, De Kalb director of public works, testified that a fixed-base operator's facility, a terminal building and two T-hangars have already been built on the site, in proximity to the existing runway. A third hangar location is ready and available, but, as yet, no additional hangar has been erected because of insufficient need or demand. Some parking-lot and runway extensions are in progress. Moreover, De Kalb has an existing master plan for development and expansion of the airport, as shown on the airport layout plan. (See figure No. 2.) De Kalb has already acquired the majority of the land needed to im-

plement the master plan and is in the process of acquiring the remainder. Naylor testified that the land acquired by the City was intended to be used only for airport purposes. Residential structures located in the various acquisitions were being removed or relocated and the land returned to open space. Naylor estimated that about $10 million had already been spent on implementing the airport master plan, with $2 million of that provided by the City. Collectively, the evidence is clear that the land is being used for airport purposes and is not subject to any plans Cortland may have. It is equally apparent that Cortland has recognized the uniqueness and significance of the airport by taking it into account in developing land use plans for nearby property. Under the circumstances, we do not think disconnection of the site will disrupt Cortland's plan.

As for the question of disruption of growth, as is evident from our discussion above, there could be no municipal growth on the Kern parcel. Consequently, disconnection would have no effect in terms of expansion into the site itself. With regard to the rest of the Town, David Dockus testified that, although Cortland had been initiating approximately 15 new residential housing starts per year for the previous four or five years, the Town had experienced a 5% decrease in population between the 1980 census and the 1990 census. There was evidence that Cortland sought to retain the site in order to maintain the residential character of the Town and that there were only a few vacant lots already platted and readily available for new home construction. However, the Town president, Kenneth Hetchler, and David Dockus gave testimony showing that there were areas available for residential development other than the subject site. Those areas were zoned residential and some were incorporated in Cortland, as reflected in the Town's 1990 zoning map. Other areas, extensive in size, were not incorporated but were depicted on Cortland's land use plan. The current zoning administrator also testified to substantial, although unplatted, room for additional single family homes in areas zoned residential and located near existing subdivisions which were already served by municipal water, sewer, and street lighting. Cortland was not providing any such services to the Kern site. Finally, De Kalb elicited the expert opinion of Michael Weber, a professional planner, who was currently working on development of a comprehensive plan for De Kalb. Weber opined that disconnection of the Kern property would not have any effect on the growth prospects of the remaining areas of incorporated Cortland.

Cortland attacks Weber's testimony on the ground that it lacked an adequate foundation because Weber did not rely on specific, de-

tailed information about Cortland itself. For example, Weber had not talked to Cortland officials, did not have a parcel-by-parcel survey of existing land uses in Cortland, and did not know Cortland's geographical size or the number of housing units or housing starts in the Town. However, Weber's testimony was directed at the effect of the airport, as shown in the airport layout plan (see figure No. 2), on the development of the surrounding area. Cortland lies in a portion of that area.

Weber's credentials and expertise as a planning professional were not challenged by Cortland. The witness was personally familiar with De Kalb and the airport expansion because of his work on De Kalb's comprehensive plan. In the course of his work Weber had reviewed De Kalb County's existing land use plan for the area, Cortland's own land use plan, Cortland's zoning ordinance, and Cortland's zoning map. He had studied aerial photos of the locality, including Cortland, and had driven through the general vicinity of the airport and through Cortland specifically, observing the land uses. Just recently, he had reviewed the 1990 census figures for Cortland and data regarding building permits in Cortland township, though not specifically for the Town of Cortland. All in all, despite some shortcomings, for its intended purpose Weber's testimony rested on a sound foundation and was properly admitted by the trial court.

■ In summary, although Cortland focuses heavily on the limitations of Weber's testimony, much other significant evidence was also offered: the expansion of the airport is already underway, and Cortland cannot control the use of the airport; Cortland's rate of growth is, at best, unclear, *i.e.*, although housing starts continue, population has decreased; Cortland already has or is planning to have substantial other, more amenable areas available for residential use, in directions away from rather than toward De Kalb and the airport. We are persuaded that the trial court's finding that disconnection will not unreasonably disrupt Cortland's growth prospects, plan or zoning ordinances was not against the manifest weight of the evidence and will not be disturbed.

Cortland also challenges the trial court's determination that, if the Kern parcel is disconnected, the Town will not be unduly harmed through the loss of tax revenue in the future. We find it significant that, just as the statute specifies that disconnection will be disallowed only if it "unreasonably" disrupts a municipality's growth prospects, the statute also establishes that disconnection will be disallowed only when it "unduly" harms a municipality through the loss of tax revenue. The legislature thus recognized that some detriment to a municipality due to revenue loss is anticipated, and even inevitable, when

property is disconnected. At the very least, the municipality will no longer receive the property tax generated by the parcel. Here, however, we do not believe Cortland will be "unduly" harmed by disconnection of the Kern site.

The trial court found, with support in the record, that Cortland could reasonably expect to receive just under $3,000 per year in property tax, sales tax, and utility tax from the parcel. The bulk of that amount—$2,144.64—would be in the form of sales tax. The sales tax figure was the City's projection for all of 1990, based on actual airport sales receipts for eight months of 1990. De Kalb, rather than Cortland, had been receiving the sales tax revenues generated by the site, and Cortland had never included revenue from airport sales in its budget calculations. Hence, as De Kalb contends, Cortland could not be harmed by the loss of revenue it never had or relied upon in the first place. However, the statute speaks of the loss of tax revenues in the future, and we think it is more significant to measure the $3,000 against the current and prospective overall financial condition of the Town.

The evidence demonstrated that Cortland had experienced significant growth in assessed valuation and corresponding tax revenue as a result of recent annexations and new industrial and commercial development. In fact, although the corporate tax rate had decreased, tax revenue increased. Cortland's current tax rate was set at .2672 cents, well below the maximum available rate of $1. The treasurer of Cortland testified that she expected virtually every fund in the township's budget to show a positive cash balance at the close of the 1990-91 fiscal year, as had been the case in 1989 to 1990. She also indicated that Cortland had not committed to any present or anticipated deficit spending.

As for the Kern parcel, it had been assessed only as a leasehold because it was owned by a public body. The assessed value of the site, which was negotiated between the Illinois Department of Revenue, the De Kalb County supervisor of assessments, and the City of De Kalb, had been set at $64,198 and was estimated to be the same for the next five years. The negotiated valuation took into account both the decreasing value of the leasehold and increasing leasehold revenue. Ronald Naylor testified, without contradiction, that the City had no current plans for public improvements on the site which might increase the assessed value of the leasehold, for private improvements which might give rise to a property tax assessment, or for any activities that might increase sales tax revenue. In cross-examination Naylor indicated that, while aircraft were not currently being sold at the

site, the fixed-based operator had the right to make such sales. Also, the sales of fuel, oil and aircraft parts had increased since the end of 1989 when the fixed-base operator had moved from a trailer at the west end of the runway to a new, permanent facility at the east end.

Cumulatively, the evidence demonstrates that, at the time of trial, Cortland was in sound and solid financial condition, even without the tax it should have been receiving from the airport sales. There was little to indicate that the Town's fiscal health would be significantly affected by the disconnection. Only a nominal amount of property and utility tax revenue was currently being generated by the Kern parcel, and there was no evidence that the value of the leasehold would increase or that the use of the property would change and produce either a significant property tax assessment or a substantial increase in utility tax revenue. In this regard we observe, too, that Cortland evidently was not expending revenues to provide municipal services to the site. De Kalb had run both a water and a sewer line to the property and had installed driveway and parking lot lighting to service the airport facilities. While it was not altogether clear which jurisdiction was providing police protection, De Kalb had been providing at least some measure of fire protection. No testimony was offered to show that Cortland was providing any services to the Kern property.

In addition, while airport sales tax revenue had increased in 1990, the projected, increased figure was the one used by the trial court. It appears the increase occurred after the fixed-base operator moved to a permanent facility provided as part of the upgrading of the airport. The evidence did not point to any sources of further, meaningful increases. Under all these circumstances, we cannot say the trial court's conclusion that Cortland would not be unduly harmed by loss of future tax revenue was contrary to the manifest weight of the evidence.

Cortland's reliance on *Desmond v. Regional Board of School Trustees, Malta Community Unit School District No. 433* (1989), 183 Ill. App. 3d 316, is misplaced. While De Kalb seeks to disconnect its property from a municipality, plaintiffs in *Desmond* sought the detachment of their property from a school district. Such a detachment was to be allowed only if the benefits to the annexing district and the detachment area clearly outweighed the detriment to the detaching district and the surrounding community as a whole. (*Desmond,* 183 Ill. App. 3d at 327.) Moreover, the petitioners' burden of proof required them to show support of their petition with substantial evidence. (*Desmond,* 183 Ill. App. 3d at 332, citing *Fixmer v. Regional Board of School Trustees* (1986), 146 Ill. App. 3d 660, 664.) These rules appear to favor the maintenance of existing school districts and to discourage

detachments. In contrast, the statute controlling disconnection from a municipality is to be liberally construed in favor of disconnection. (*Harris Trust & Savings Bank v. Village of Barrington Hills* (1989), 133 Ill. 2d 146, 154-55.) Hence, upon review the two proceedings are subject to distinctly different standards.

We denied the petition for detachment in *Desmond* even though the tax revenue generated by petitioner's property seemed relatively small. Cortland emphasizes that it will lose far more, in relation to its general operating fund, than the school district in *Desmond* would have lost relative to its overall budget. However, we question first of all whether Cortland is comparing apples to apples. Cortland's operating fund is not its entire budget, just as the total budget of the school district in *Desmond* did not consist solely of its operating fund. Aside from that question, we point out that the effect on tax revenues is not the only factor to be considered, in either a school detachment or a municipal disconnection. The loss of tax revenue will be given weight in accord with its consequences in either setting. As we expressed it in *Phillips v. Special Hearing Board* (1986), 154 Ill. App. 3d 799, a case relied upon in *Desmond*, "[a] financial detriment to the losing district alone *** is not a sufficient basis for denying a detachment petition unless the loss would be a serious one." *Phillips*, 154 Ill. App. 3d at 803.

In *Desmond* we could not say that, for the particular detaching school district, the loss of funds was not serious in that it would not affect the district's financial health and ability to meet the statutory standards for recognition. (*Desmond*, 183 Ill. App. 3d at 330-31.) In contrast, we are confident that Cortland's current, sound financial health and viability as a municipality will not be endangered by the future loss of $3,000 in tax revenue. This is particularly so since more than $2,000 of that amount has not previously been available for Cortland's use and will not be felt as a "loss" at all. *Desmond* is not persuasive on the loss of tax revenue issue as it occurs in this case.

For the reasons set forth above, the order of the circuit court of De Kalb County granting plaintiff's petition for disconnection is affirmed.

Affirmed.

INGLIS, P.J., and GEIGER, J., concur.