Nos. 2--08--0349, 2--08--0350, 2--08--0356, 2--08--0357, 2--08--0358 cons.

Filed: 10-15-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re PETITION TO DISCONNECT CERTAIN TERRITORY FROM THE VILLAGE OF CAMPTON HILLS, KANE COUNTY, ILLINOIS | ) ) ) ) | Appeal from the Circuit Court of Kane County.<br><br>No. 07--MC--12 |
| | ) | |
| (Scott Horton, Michele Horton, Stephanie Fahey, Paul Fahey, Donald Krause, Bonnie Krause, Dorothy A. White, Robert E. White, Harold Broten, Karen Broten, Wayne Lange, Robert A. Klock, Denise M. Klock, Jean Francissen, Kathleen M. Champion, Patrick Francissen, and Vernon W. Francissen, Petitioners-Appellees, v. The Village of Campton Hills, Respondent-Appellant). | ) ) ) ) ) ) ) ) ) ) ) ) | <br><br><br><br><br><br><br><br>Honorable<br>Michael J. Colwell,<br>Judge, Presiding. |

| | | |
|---|---|---|
| In re PETITION TO DISCONNECT CERTAIN TERRITORY LOCATED IN KANE COUNTY, ILLINOIS FROM THE VILLAGE OF CAMPTON HILLS | ) ) ) ) ) | Appeal from the Circuit Court of Kane County.<br><br>No. 07--MC--4 |
| (Walter Kold, et al., Petitioners-Appellees, v. The Village of Campton Hills, Respondent-Appellant). | ) ) ) | Honorable<br>Michael J. Colwell,<br>Judge, Presiding. |

| | | |
|---|---|---|
| In re PETITION TO DISCONNECT CERTAIN TERRITORY COMMONLY KNOWN AS THE CHEVAL DE SELLE SUBDIVISION AND ADJOINING PROPERTIES FROM THE VILLAGE OF CAMPTON HILLS | ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Kane County.<br><br>No. 07--MR--474 |
| (M.R. Sanborn, et al., Petitioners-Appellees, v. The Village of Campton Hills, Respondent- | ) ) | Honorable<br>Michael J. Colwell, |

Nos. 2--08--0349, 2--08--0350, 2--08--0356, 2--08--0357, 2--08--0358 cons.

| | |
|---|---|
| Appellant). | ) Judge, Presiding. |

_____

| | |
|---|---|
| <u>In re</u> PETITION TO DISCONNECT | ) Appeal from the Circuit Court |
| CERTAIN TERRITORY LOCATED IN | ) of Kane County. |
| KANE COUNTY, ILLINOIS FROM THE | ) |
| VILLAGE OF CAMPTON HILLS | ) No. 07--MC--5 |
| | ) |
| (Gene Miceika, et al., Petitioners-Appellees, v. | ) Honorable |
| The Village of Campton Hills, | ) Michael J. Colwell, |
| Respondent-Appellant). | ) Judge, Presiding. |

_____

| | |
|---|---|
| <u>In re</u> PETITION TO DISCONNECT | ) Appeal from the Circuit Court |
| CERTAIN TERRITORY LOCATED IN | ) of Kane County. |
| KANE COUNTY, ILLINOIS FROM THE | ) |
| VILLAGE OF CAMPTON HILLS | ) No. 07--MC--11 |
| | ) |
| (Dawn Chantos, et al., Petitioners-Appellees, v. | ) Honorable |
| The Village of Campton Hills, | ) Michael J. Colwell, |
| Respondent-Appellant). | ) Judge, Presiding. |

_____

JUSTICE BURKE delivered the opinion of the court:

The Village of Campton Hills (the Village) was incorporated in 2007. Pursuant to section 7--3--1 of the Illinois Municipal Code (Municipal Code) (65 ILCS 5/7--3--1 (West 2006)), property owners who meet certain criteria may disconnect from a newly formed municipality within one year of incorporation. This consolidated appeal involves five groups of property owners (petitioners) who filed petitions to disconnect from the Village, pursuant to section 7--3--1: (1) case No. 07--MR--12 (Campton Farms); (2) case No. 07-- MC--4 (Prairie Lakes); (3) case No. 07--MR--474 (Cheval de Selle); (4) case No. 07--MC--5 (Hidden Oaks); and (5) case No. 07--MC--11 (Moraines). Except in the Prairie Lakes and Hidden Oaks cases, which were tried together, the circuit court of Kane

County conducted separate evidentiary hearings to determine whether petitioners met the statutory criteria for disconnection. On March 20, 2008, the court entered judgments in favor of petitioners and ordered all five territories to be disconnected from the Village.

The Village appeals, raising several arguments. In general, it contends that the judgments must be reversed because: (1) section 7--3--1 is not applicable to petitioners' disconnection claims; (2) section 7--3--1 requires that each individual parcel in a disconnecting territory "touch" the municipality's border; (3) petitioners failed to provide adequate notice; (4) disconnection abridged the due process rights of unnamed property owners; (5) the trial court abused its discretion by admitting or refusing to admit certain evidence; (6) the trial court erred in qualifying petitioners' expert witnesses and allowing them to present their opinions, because they lacked adequate foundations; (7) the judgments were against the manifest weight of the evidence; and (8) the trial court failed to account for the cumulative impact of additional pending disconnection suits. For the following reasons, we affirm.

BACKGROUND

The record is voluminous and the evidence is well known to the parties. Accordingly, we will refer only to evidence that is relevant to our analysis.

By way of background, we note the following. The Village filed its first petition to incorporate as the Village of Campton Hills in August 2005. Under Illinois law, the Village could not be incorporated unless the Kane County Board (Board) found that the proposed incorporation was compatible with the official plan for the development of the county and that the Village would have a tax base sufficient to provide all the necessary municipal services to its inhabitants. The incorporators, a committee that included chairperson Patsy Smith, who is now Village president, and

that was represented by William Braithwaite and the law firm of Arnstein & Lehr, presented their first petition to the Kane County Regional Planning Commission (Planning Commission) and the Board. During those proceedings, the incorporators argued that the proposed Village had a sufficient tax base and that the sufficiency of that tax base should be measured by the Village's equalized assessed value (EAV). Braithwaite informed the Board that, "[a]lthough we enclose as part of this Petition additional information as to the adequacy of budgeting for the new Village without any tax levy, that is not the test. Rather, the test is whether there is a sufficient tax base which, if it becomes necessary to levy a tax, we can provide municipal services at a realistic tax rate." Braithwaite added that the Village could generate significant funds with "a modest levy of $.10 per $100 of equalized assessed valuation."

The Kane County Development Department (Department) agreed with that approach. Philip Bus, the Department's executive director, concluded that the proposed Village had a total EAV of $604,179,886 and an EAV per capita of approximately $40,000, which was "among the highest in Kane County." On the basis of those figures, he found that the Village's tax base was sufficient. The Department, however, found that the proposed incorporation was incompatible with Kane County's long-range plans, in part because the Village would include significant amounts of agricultural land that were within Lily Lake's planning jurisdiction. Accordingly, the Board declined to make the requisite findings.

The incorporators filed a second petition for incorporation on November 6, 2006, contemplating a smaller land area, which did not include the agricultural land surrounding Lily Lake. The incorporators argued again that the Village's tax base was sufficient because of the high EAV and EAV per capita. On November 6, 2006, Smith informed the Board that the new proposed

Village would have "an estimated Equalized Assessed Value of approximately $50,000 per capita." The Department agreed with that approach and found that the new proposed Village had a sufficient tax base and that incorporation was compatible with Kane County's long-range plans. Accordingly, the trial court authorized a referendum on the question of whether to incorporate the Village. On April 17, 2007, the voters approved the ballot initiative and on May 14, 2007, the trial court authorized the incorporation.

The newly incorporated Village is very large. It encompasses 20.3 square miles and includes 102 miles of road. Based on figures from the 2000 census, the Village has certified 10,504 residents. However, the Village estimates that its population has increased by approximately 2,500 persons since 2000, and the Village has commissioned a special census to determine the actual population.

In May 2007, petitioners began filing petitions to disconnect from the Village pursuant to section 7--3--1, which provides:

"Within one year of the organization of any municipality *** any territory which has been included therein may be disconnected from such municipality if the territory sought to be disconnected is (1) upon the border, but within the boundary of the municipality, (2) contains 20 or more acres, (3) if disconnected will not result in the isolation of any part of the municipality from the remainder of the municipality, and (4) if disconnected will not be a territory wholly bounded by one or more municipalities or wholly bounded by one or more municipalities and a river or lake, (5) if disconnected, the growth prospects and plan and zoning ordinances, if any, of such municipality will not be unreasonably disrupted, (6) if disconnected, no substantial disruption will result to existing municipal service facilities such as, but not limited to, sewer systems, street lighting, water mains, garbage collection and fire

protection, (7) if disconnected the municipality will not be unduly harmed through loss of tax revenue in the future." 65 ILCS 5/7--3--1 (West 2006).

Prairie Lakes consists of 197.48 acres and 170 platted single-family lots. It is populated by 166 residents who occupy 51 homes. Hidden Oaks consists of 35 single-family lots totaling 59.96 acres. Approximately 98 residents occupy 30 homes. Only five of Hidden Oaks' tracts of land are located directly on the border of the Village. Cheval de Selle includes approximately 351 residents. It consists of 102 parcels, all of which are zoned for single-family homes. The Moraines has 24 parcels ranging from 1 to 2.5 acres and zoned for single-family homes, and all but 2 parcels are developed with single-family homes. The population is estimated at 72 persons. Campton Farms consists of 87.1 acres, which are owned by 17 individuals, and has 21 residents.

The Village presented the following common assertions throughout the disconnection cases. The Village argued that it was in its infancy and most formative period with respect to its growth prospects, planning, and zoning and that any change resulting from these disconnections would unreasonably disrupt and negatively impact the newly formed Village. The Village further argued that it levied no real estate property tax and did not plan to and, therefore, its sources of revenue were limited to state-shared funds, a portion of the township road fund tax, and sales tax. It further argued that it did not receive tax revenue based on the average assessed or equalized assessed valuation for all property within the Village. Therefore, the Village maintained, it was likely to suffer great loss of tax revenue if the court granted the disconnections. Based on the evidence, the trial court rejected these and other arguments and granted the disconnections. The Village timely appealed and we granted motions to consolidate.

ANALYSIS

## I. Burden

In disconnection cases, the petitioners have the burden of proving the statutory requirements. City of DeKalb v. Town of Cortland, 233 Ill. App. 3d 307, 310 (1992). However, the disconnection statute is to be liberally construed in favor of disconnection (Harris Trust & Savings Bank v. Village of Barrington Hills, 133 Ill. 2d 146, 154-55 (1989)), regardless of the petitioners' purpose. Indian Valley Golf Club, Inc. v. Village of Long Grove, 135 Ill. App. 3d 543, 547 (1985). The common theme is to allow disconnection absent a hardship or impairment to the municipality. Indian Valley Golf Club, 135 Ill. App. 3d at 547.

## II. Applicability of Section 7--3--1

The Village first contends that section 7--3--1 is not applicable to petitioners' disconnection petitions. The Village asserts that section 7--3--1 applies only to single-parcel disconnections whereas section 7--3--6 applies to multiple-parcel disconnections. See 65 ILCS 5/7--3--6 (West 2006). The Village argues that, because the present disconnection petitions involve multiple parcels and were filed under section 7--3--1 instead of section 7--3--6, the cases should have been dismissed. In support of its argument, the Village contrasts the language in section 7--3--1 that permits disconnection of "any territory" (emphasis added) (65 ILCS 5/7--3--1 (West 2006)) with the language in section 7--3--6 that permits disconnection of "any area of land consisting of one or more tracts" (emphasis added) (65 ILCS 5/7--3--6 (West 2006)). The Village maintains that section 7--3--1's omission of the emphasized text in section 7--3--6 should be construed to mean that the legislature wanted to limit section 7--3--1 to single parcels. Because this issue involves statutory interpretation, our review is de novo. In re Marriage of Best, 228 Ill. 2d 107, 116 (2008).

We find that this argument lacks merit. Clearly, section 7--3--1 is not limited to single parcels. Section 7--3--1 requires that the "territory" to be disconnected must be 20 or more acres and must not be wholly bounded by one or more municipalities and a river or lake. It makes no sense to infer that the legislature intended a "single parcel" limitation when it did not simply state such a limitation in section 7--3--1. Regardless, section 7--3--1 allows a petition for disconnection to be signed by a "majority" of property owners, which clearly implies that the legislature intended that this section apply to multiple-parcel disconnections. We agree with petitioners that it is difficult to imagine a scenario where a "majority" of property owners could exist in the absence of multiple parcels.

In addition, both section 7--3--1 and section 7--3--6 permit disconnection of a "territory." It is clear that a "territory" may include "multiple parcels," and Illinois courts have consistently permitted the annexation and disconnection of multiple-parcel "territories" under section 7--3--1 and 7--3--6. See, e.g., In re Disconnection of Certain Territory from the Village of Machesney Park, 122 Ill. App. 3d 960, 972 (1984) (wherein we affirmed the disconnection of a multiple-parcel territory under section 7--3--1); see also La Salle National Trust, N.A. v. Village of Mettawa, 249 Ill. App. 3d 550, 578 (1993) (affirming the disconnection of an 11-tract territory under section 7--3--6).

### III. Bordering Territories

The Village next contends that the trial court erred in ruling that the disconnecting territories are located "on the border" of the Village. The Village asserts that section 7--3--1 requires that a disconnecting territory cannot be "on the border" unless each and every individual parcel in the disconnecting territory also lies on the border.

In Village of Mettawa, 249 Ill. App. 3d at 564-65, and Indian Valley Golf Club, Inc. v. Village of Long Grove, 135 Ill. App. 3d 543, 552, 554 (1985), we held that, where there is reasonable contiguity among parcels in a territory to be annexed, even extreme irregularity of boundaries does not bar annexation. The Village suggests that these decisions were premised on the commonality of ownership. However, we find nothing in those decisions to suggest that they were premised on the commonality of ownership.

Similarly, nothing in the disconnection statute draws a distinction based on common ownership. Section 7--3--1 states only that land to be disconnected must be located on the border of the municipality from which it is being disconnected; it does not state that all parcels in the disconnecting land must be on borders, and it could not reasonably be interpreted in that manner if it were ever to be given any effect. 65 ILCS 5/7--3--1 (West 2006). The principal object in construing a statute is to ascertain and give effect to the intention of the legislature. Indian Valley Golf Club, 135 Ill. App. 3d at 552. The plain meaning of the language used by the legislature is the safest guide to follow in construing any act, as the court has no right to read into the statute words that are not found therein either by express inclusion or by fair implication. Indian Valley Golf Club, 135 Ill. App. 3d at 552. Therefore, we also reject this argument.

IV. Notice Requirement

The Village next contends that petitioners failed to provide adequate notice to all nonpetitioner taxpayers and property owners under the notice provisions set forth in sections 7--3--2 and 7--3--6.1 of Article 7 of the Municipal Code. 65 ILCS 5/7--3--2, 7--3--6.1 (West 2006). The Village contends that petitioners were required to publish the dates of the public hearings and to send certified letters to all nonpetitioner taxpayers and property owners notifying them of the very first

court appearance, even if the first court appearance was a routine motion presentment call rather than the public hearing. The Village claims that any failure to provide such notice of the very first court appearance was incurable and required immediate dismissal. We note that the Village stipulated that petitioners provided proper notice in the Cheval de Selle case. Similarly, in the Campton Farms case, petitioners obtained waivers of notice from the only two nonpetitioner taxpayers and property owners. Thus, the Village's argument applies only to the remaining three cases.

The Village presents a question of statutory interpretation. The principles guiding our analysis are familiar. The primary objective in construing a statute is to ascertain and give effect to the legislature's intent, with the best indication of that intent being the plain and ordinary meaning of the statute's language. Wisniewski v. Kownacki, 221 Ill. 2d 453, 460 (2006). All other rules of statutory construction are subordinate to this cardinal principle. In re Detention of Lieberman, 201 Ill. 2d 300, 312 (2002). In construing statutes, courts will presume that the legislature did not intend absurdity, inconvenience, or injustice. Alvarez v. Pappas, 229 Ill. 2d 217, 228 (2008). The construction of a statute presents a question of law, which we review de novo. In re Marriage of Best, 228 Ill. 2d 107, 116 (2008).

The first notice provision of the disconnection statute is in section 7--3--2, which provides, in relevant part:

"Upon the filing of the petition as provided in Section 7--3--1, the court shall set the same for public hearing which date of public hearing shall be within 30 days of the date of the filing of the petition. The court shall give at least 10 days notice of such hearing by publishing notice thereof once in a newspaper published in the municipality from which the territory is sought to be detached, or if there is no such newspaper published in such

-10-

municipality, then such notice shall be published once in a newspaper having a general circulation within such municipality, the date of such publication to be not less than 10 days prior to the date set for the public hearing." 65 ILCS 5/7--3--2 (West 2006).

The trial court complied with the public hearing and notice requirements under section 7--3--2.

The other notice provision is in section 7--3--6.1, which follows the disconnection provision of section 7--3--6. Section 7--3--1 applies to a disconnection from a newly formed municipality, whereas a petition seeking disconnection from an established municipality would be filed under section 7--3--6. Section 7--3--6.1 provides, in relevant part:

"When territory is proposed to be disconnected by court order under this Article, the corporate authorities or petitioners initiating the action shall notify each person who pays real estate taxes on property within that territory unless the person is a petitioner. The notice shall be served by certified or registered mail, return receipt requested, at least 20 days before a court hearing or other court action. If the person who pays real estate taxes on the property is not the owner of record, then the payor shall notify the owner of record of the proposed disconnection." 65 ILCS 5/7--3--6.1 (West 2006).

We do not find that the notice requirements of section 7--3--6.1 also apply to disconnection actions brought pursuant to section 7--3--1. Clearly, when the legislature placed section 7--3--6.1 after section 7--3--6, it intended that section 7--3--6.1 apply only to actions for disconnections brought pursuant to section 7--3--6. Although section 7--3--6.1 contains language stating that it applies to all petitions for disconnection "under this Article," the scheme of Article 7 clearly identifies separate notice requirements for each method of disconnection, and the notice requirements for a section 7--3--1 petition are expressly provided for in section 7--3--2.

Moreover, section 7--3--6.1's 20-day requirement makes it incompatible with actions brought under section 7--3--1. As the trial court noted, section 7--3--6 and section 7--3--6.1 contemplate court proceedings with no time limitations. See 65 ILCS 5/7--3--6 (West 2006). By contrast, section 7--3--2 requires a "public hearing" within 30 days. Complying with the 30-day public hearing requirement would be difficult if petitioners were required to provide 20 days' notice of the public hearing via certified mail. We further note that it would be impossible to comply with the 30-day requirement if section 7--3--6.1 required 20 days' notice of the very first court appearance at which the public hearing was scheduled. Regardless, as the trial court held, petitioners provided proper notice of the relevant "public hearings" and "court actions" by timely publishing notices in the newspapers and by sending certified letters to all nonpetitioner taxpayers and owners within the disconnecting territories.

The Village contends that such efforts were useless in any event because section 7--3--6.1 required petitioners to provide notice of the very first court appearance in each case, and it contends that the failure to do so was incurable. First, we do not find that section 7--3--6.1 controls. Even if it were controlling, we find nothing in the statute that requires notice of the first court appearance. Section 7--3--6.1 simply states that notice must be given 20 days before "a court hearing or other court action." 65 ILCS 5/7--3--6.1 (West 2006). We construe such language to mean that notice is required before a substantive "court hearing" or "court action," not a routine motion call of no consequence to a nonpetitioner taxpayer or owner. Finally, the time limitations in section 7--3--6.1 are directory only, because the statute does not provide a penalty for noncompliance. Therefore, any failure to strictly comply with such notice does not invalidate the petition to disconnect. See Village of Machesney Park, 122 Ill. App. 3d at 966. In sum, we find the Village's arguments unavailing.

V. Due Process

The Village next argues that disconnection abridged the due process rights of unnamed property owners. The Village claims that petitioners were permitted to directly and materially affect the status of literally hundreds of nonpetitioners by seeking disconnection of their property. The Village ignores the purpose of the notice requirements of section 7--3--2, which is to protect nonpetitioners' rights to be heard. Accordingly, we also reject this argument.

VI. Evidentiary Rulings

The Village next takes issue with several of the trial court's evidentiary rulings. Evidence is relevant where it tends to prove a matter in controversy or has a legitimate bearing on a disputed matter. Northern Illinois Medical Center v. Home State Bank of Crystal Lake, 136 Ill. App. 3d 129, 152 (1985). The determination of whether particular evidence is relevant is within the discretion of the trial court and will not be disturbed absent an abuse of discretion. In re Estate of Hoover, 155 Ill. 2d 402, 420 (1993).

The Village first asserts that the trial court erred in including evidence regarding EAV, property taxes, and other potential revenue sources. Petitioners pointed out that the Village had the ability to generate revenue through property taxes. In all of the cases, except Cheval de Selle, petitioners also noted that the Village had other untapped sources of revenue, such as utility taxes and franchise taxes. The Village claims that such evidence was irrelevant and argues that the trial court's analysis of the Village's future tax revenues should be limited to those sources that the Village is currently utilizing. We disagree.

We first find that any error by the trial court regarding this issue was harmless, as in each case the trial court specifically found that disconnection would not "unduly harm" the Village, even

if the Village continued to operate on only its current revenue sources. For example, the trial court found in the Moraines case that the Village's disclosed 2008 revenues were at least $1,955,755, and its anticipated 2008 expenses were only $1,484,770. Therefore, the Village was projecting a surplus of nearly $500,000, which was more than enough to accommodate all five disconnections. The trial court found that the Village could have a cumulative surplus through 2017. The trial court made similar findings in the other four cases.

Furthermore, section 7--3--1 allows an analysis of the impact on a municipality's "future" tax revenue, not its "current" tax revenue. Thus, a trial court may consider revenue sources that may be available in future years even if they are not currently being utilized. See, e.g., Village of Mettawa, 249 Ill. App. 3d at 571 (court "may take into account the availability of other sources of revenue to replace the revenue lost to the municipality").

The Village also asserts that the trial court improperly considered statements and analyses regarding the Village's EAV and EAV per capita that were made before it became incorporated. As stated, during preincorporation hearings, the Village's current president, Smith, and its counsel, Braithwaite, mentioned the Village's EAV and EAV per capita as evidence that the Village had a sufficient tax base. During each case, evidence of preincorporation conduct and statements were admitted in several contexts: (1) through Philip Bus's testimony (in the Cheval de Selle and Campton Farms cases); (2) through various documents; and (3) through Steven Hovany's testimony. The Village asserts that such evidence should have been excluded as irrelevant.

We observe first that the Village forfeited many of its objections by failing to raise them before the trial court. Regardless of forfeiture, the evidence was relevant because it tended to prove a matter in controversy. One of the Village's primary arguments was that EAV and property taxes

could not be used to evaluate the Village's tax base. In response to that argument, petitioners were entitled to show that Smith, Bus, and Braithwaite all previously advocated the consideration of that revenue source. Such evidence bolstered Hovany's and Steven Lenet's analyses and called Smith's credibility into question by demonstrating that she took a contrary position when it was in her interest to do so.

### VII. Qualifications and Opinions of Expert Witnesses

The Village next contends that the trial court erred by qualifying petitioners' expert witnesses and, even if the trial court did not err in qualifying them, by allowing them to present their opinions, because the witnesses failed to present adequate foundations.

Expert testimony is admissible if it assists the trier of fact in understanding the evidence or deciding a fact in issue and if the witness is qualified by reason of knowledge, skill, experience, education, or training to give said testimony. Village of Plainfield v. American Cedar Designs, Inc., 316 Ill. App. 3d 130, 139 (2000). If the expert's opinion is without proper foundation, particularly where he or she fails to take into consideration an essential factor, that opinion " 'is of no weight and must be disregarded.' " People v. Wilhoite, 228 Ill. App. 3d 12, 21 (1991), quoting 32 C.J.S. Evidence §569(1), at 609 (1964). Decisions regarding the admissibility of evidence and the sufficiency of the qualifications of an expert rest within the sound discretion of the trial court. Sobczak v. Flaska, 302 Ill. App. 3d 916, 929 (1998). Such decisions will not be reversed on appeal unless an abuse of discretion has occurred. Village of Plainfield, 316 Ill. App. 3d at 140.

During the course of the evidentiary hearings, the trial court heard testimony from several expert witnesses, including Hovany, Joseph Abel, Lenet, Bus, and Ronald Lanz. The trial court qualified each as an expert in his respective field and ultimately agreed with their conclusions.

We observe that the Village forfeited much of this argument by failing to make objections before the trial court. The Village did not object to Bus's testimony or to Hovany's and Abel's qualifications. The Village also did not object to Lenet's qualifications. Having failed to object in the trial court, the Village is barred from raising many of its objections before this court.

Moreover, we do not find that the trial court abused its discretion in qualifying the witnesses to render expert testimony. Abel has over 40 years of experience in land planning and was Du Page County's lead planner for 17 years. Hovany has a master's degree in urban planning, was the lead planner for Naperville and Schaumburg, and had performed hundreds of municipal tax base studies during his career. Bus is Kane County's director of development, has over 30 years of experience in land use, and was very familiar with Kane County and the Village. Lenet has a master's degree in urban planning, has over 40 years of experience in urban planning, and had been qualified as an expert in numerous disconnection cases. Lanz has a master's degree in urban planning and has 10 years of experience as a municipal planner and private consultant.

As to the lack of foundation, the Village claims that the witnesses relied solely on irrelevant preincorporation statements. We found that the preincorporation statements were relevant. Thus, the Village's argument lacks merit. In any event, Abel's, Lenet's, and Lanz's opinions on comprehensive planning were not based on preincorporation statements. Similarly, Hovany's and Lenet's opinions regarding the Village's future tax revenues were based on their analyses of financial and population information provided by the Village. While they referred to certain preincorporation statements to buttress their opinions, their opinions were not based on those statements. In addition, they relied on other sources of tax revenues to buttress their opinions.

The Village complains that the witnesses lacked experience to give opinions about the Village. We find this argument unavailing also. The Village certainly has some unique characteristics; however, its land use, zoning, and comprehensive and financial planning operate under the same laws and rules as those of other similar municipalities. There is no reason why professionals with vast experience in dealing with municipalities similar to the Village cannot use their experience to render opinions regarding the Village. We note too that some of the witnesses did have experience with the Village. Bus was present at the creation of the Village and analyzed its tax base twice. Hovany's analysis included a review of Bus's work regarding the Village.

### VIII. Manifest Weight of the Evidence

The Village first asserts that the trial court "construed the evidence in favor of disconnection as if petitioners had to meet a 'lowered' standard." It is unclear whether the Village takes issue with the trial court's evidentiary rulings or its construction of the disconnection statute. The Village argues that, by analyzing the effect of disconnection on an 11-month old municipality as though it were a long-established and mature community, the trial court failed to take into account the unique circumstances facing the Village and thus lessened the petitioners' burden of proof. The Village appears to take issue with the statute's "unduly harmed" standard, because of its "unique" status as a rural, newly-established community. It suggests that the trial court should have crafted a new standard to account for the "unique confluence of issues" in this case.

The Village offers no authority to support its claim that a different standard should be applied to new municipalities. The "unduly harmed" standard applies to new municipalities, under section 7--3--1, and also applies to established municipalities, under section 7--3--6 (65 ILCS 5/7--3--1, 7--3--6 (West 2006)). The Village does not identify what it believes to be the correct standard or how

-17-

the correct standard differs from the current standard. The Village also offers no evidence to suggest that the trial court construed the evidence in favor of disconnection as if petitioners had to meet a lower standard. Accordingly, we reject this argument.

Next, the Village contends that the trial court's judgments should be reversed because they were against the manifest weight of the evidence. The Village complains that petitioners failed to establish the necessary seventh requirement of section 7--3--1 that "if disconnected the municipality will not be unduly harmed through loss of tax revenue in the future." 65 ILCS 5/7--3--1 (West 2006). The Village points out that the experts relied almost entirely on the EAV, which was irrelevant because the Village did not have the legal right to levy a property tax and it was unlikely that it would in the future. The Village also asserts that petitioners did not establish that there would be any revenues to offset the losses from the disconnections.

With respect to the seventh requirement, the plain language of the statute makes it clear that disconnection should be allowed unless it "unduly" harms a municipality through loss of tax revenue in the future. 65 ILCS 5/7--3--1 (West 2006); Mettawa, 249 Ill. App. 3d 571; City of De Kalb v. Town of Cortland, 233 Ill. App. 3d 307, 313-14 (1992) (analyzing the same language under section 7--3--6). Thus, the legislature recognized that a municipality will likely suffer some loss of tax revenue in the future because it will no longer receive the taxes generated by the disconnected property, and that loss, by itself, is not necessarily sufficient to bar disconnection. City of De Kalb, 233 Ill. App. 3d at 313-14. A determination of whether the loss of tax revenue in the future will unduly harm a municipality may take into account the availability of other sources of revenue to replace the lost revenue. Mettawa, 249 Ill. App. 3d 571. We will not disturb the trial court's finding that petitioners established the statutory requirements for disconnection unless the finding is clearly

contrary to the manifest weight of the evidence. JLR Investments, Inc. v. Village of Barrington Hills, 355 Ill. App. 3d 661, 668 (2005). A decision is against the manifest weight of the evidence only when the opposite conclusion is apparent or when findings appear to be arbitrary, unreasonable, or not based on the evidence. JLR Investments, 355 Ill. App. 3d at 668.

We first observe that, in each case, contrary to the Village's assertion, the trial court did not just rely on the experts' analyses of the EAV and the levying of property taxes in concluding that the proposed disconnection would not unduly harm the Village through the loss of tax revenue in the future. The trial court also relied on other potentially available sources of revenue, such as utility taxes, telecom taxes, vehicle sticker taxes, franchise taxes, and transfer taxes.

Second, the trial court disapproved of the Village's argument that the expert witnesses could not rely on EAV per capita and the implementation of property taxes in analyzing whether the proposed disconnection would unduly harm the Village. The court observed that, during its incorporation phase, the Village used the same methodology in its successful effort to persuade the Board to approve the petition for incorporation, and the court was troubled by the Village's apparent about-face on this issue. The court would not credit the Village's repeated protestations that it could not impose a property tax without a referendum. The court commented that the Village incorporators were aware of that obstacle when they presented their case to the Board. In addition, the court remarked that virtually all property tax increases require some type of political process prior to implementation. The court opined that the mere fact that such a process might encounter political opposition was not extraordinary and that the Village had not introduced any evidence to suggest that a referendum to impose a property tax presented any sort of "insurmountable obstacle." The court was not persuaded that it could simply disregard such alternate sources of funding simply because

the Village had not attempted to utilize those sources, or because its elected officials feared it would be politically inexpedient to do so. We agree with the trial court's assessment.

In the Cheval de Selle case, the trial court credited the testimony of expert witnesses Hovany and Bus regarding the appropriate method to use in determining whether a municipality could meet future revenue needs. The court also found that examining the EAV per capita was amply supported by the record. Moreover, the court found that Hovany's testimony regarding the impact of disconnection on the Village's EAV per capita was well supported and was not contested by the Village. Based on Hovany's testimony, the court found that the Village currently had an EAV per capita of between $46,000 and $51,000, which was significantly higher than those in surrounding municipalities and would be increased, not decreased, by disconnection.

In any event, the trial court further found that disconnection would not unduly impair the Village's non-property-tax sources of revenue. For 2008, the Village had budgeted expenses of $1,484,770. During that same year, the Village projected non-property-tax revenues well in excess of $2 million, including per capita funds that, based on its census, will increase every year through 2017, road and bridge funds, sales taxes, and building permits. The fact that this was "speculative" was of no moment, as it was obvious that the Village had untapped sources of revenue available. Moreover, the evidence revealed that the loss from disconnection would be approximately 2% to 3% of the Village's revenue. Undoubtedly, the loss of approximately 2% to 3% of the Village's revenue would be short-lived because of the numerous other sources of revenue available to the Village. See Sun Electric Corp. v. Village of Prairie Grove, 59 Ill. App. 3d 608, 614 (1978). Based on the facts of this case, we conclude that the trial court's finding, that the disconnection of the Cheval de Selle

territory would not cause the Village to suffer undue harm through the loss of tax revenue in the future, was not against the manifest weight of the evidence.

In the Prairie Lakes case, Hovany determined, using conservative assumptions, that the Village would be able to generate between $437,118 and $512,898 in additional tax revenues from the other sources named above. He determined that those additional tax revenues far exceeded the potential loss of tax revenue resulting from the disconnection, which he calculated to be only $38,746. On the basis of his analysis, Hovany concluded that the proposed disconnection would not unduly harm the Village through the loss of tax revenue in the future.

Kathy Catalano, the Village's treasurer, admitted that, when she calculated losses from the proposed disconnection, she included all portions of state-shared revenue, including a road and bridge tax, but, when she calculated the Village's total revenues, she did not include the road and bridge tax portion of the state-shared revenue. She admitted that, if the Village properly included all revenues, including road and bridge tax revenue, the Village would operate at a surplus of $392,799 in its first full fiscal year of operation. Catalano further admitted that, if the Village operated with that surplus, the Village would not suffer undue harm through the loss of tax revenue in the future. Based on the facts of this case, we conclude that the trial court's finding, that the disconnection of the Prairie Lakes territory would not cause the Village to suffer undue harm through the loss of tax revenue in the future, was not against the manifest weight of the evidence.

In the Hidden Oaks case, which was tried at the same time as the Prairie Lakes case, Hovany performed an analysis of potential tax revenues that would be available to the Village from those sources listed above. He determined, using conservative assumptions, that the Village would be able to generate between $440,951 and $516,731 in additional tax revenues from those limited sources.

The trial court concluded that those potential additional revenues far exceeded the potential losses resulting from the disconnection, which Hovany calculated to be only $20,174. Further, the trial court considered the testimony of Catalano, who admitted that, if the Village properly included all revenues, including road and bridge tax revenue, the Village would operate at a surplus in its first full fiscal year of operation. She further admitted that, if the Village operated with that surplus, it would not suffer undue harm through the loss of tax revenue in the future. Based on the facts of this case, we conclude that the trial court's finding, that the disconnection of the Hidden Oaks territory would not cause the Village to suffer undue harm through the loss of tax revenue in the future, was not against the manifest weight of the evidence.

In the Moraines case, the trial court found that Hovany was the only expert who offered an opinion on the specific issue of undue harm. The court credited his testimony, finding that he was well qualified to offer expert analysis on the issue and that his testimony regarding the appropriate method to use in determining whether a municipality could meet future revenue needs was amply supported by the record. The court found that Hovany's testimony regarding the impact of disconnection on the Village's EAV per capita was well supported and was not contested by the Village. Based on Hovany's testimony, the court found that the Village currently had an EAV per capita of between $46,600 and $50,000, that the figure was significantly higher than those in surrounding municipalities and would be increased, not decreased, by disconnection, and that the EAV per capita for the disconnecting territory was $39,556.

The trial court further found that disconnection would not impact the Village's non-property-tax sources of revenue. Catalano estimated the annual shortfall in revenue from the disconnecting territory at between $11,500 and $15,500 over a 10-year period. She stated that the Village was

currently $40,000 in the black. The court found that the revenue that the Village received from the disconnecting territory was a tiny fraction of the total revenue available to it, since the Village was receiving considerable revenue from various other sources. In 2008, the court noted, the Village will receive $132.45 in "per capita" revenue from the State for each of its 10,504 certified residents, a total of $1,391,255. If the Village's census reveals 2,500 new residents and a new population of 13,004, the Village's total revenue at the 2008 rates will grow to $1,722,380. The Village also projected that it would receive approximately $450,000 in road and bridge funds. Catalano estimated that the Village had over 200 businesses within its boundaries that would potentially generate sales-tax revenue. Hovany projected that just 18 to 24 of those businesses would annually generate $130,000 in sales taxes for the Village. The Village currently imposed fees for liquor licenses and expected to receive $12,500 per year. Building permits cost between $30,000 and $37,000. These sources of revenue do not include sales taxes from the other roughly 180 businesses or revenue from other sources such as vehicle stickers, utility taxes, fines and penalties. However, as the court pointed out, even the Village's disclosed revenue was enough to create a surplus in 2008 and the ensuing years. "When Ms. Catalano's projections regarding future growth are applied to the 2008 figures for the entire Village (and not just to revenue figures for the Disconnect Territory) it paints a rosy picture for the Village of Campton Hills." In fact, the court found that, under Catalano's projections, the Village should have a budget surplus in each year through 2013, and a cumulative budget surplus through 2017. While these were projections based on the Village's figures and methodology, they showed that the loss of $11,500 to $15,500 of annual revenue would be inconsequential to the Village. Based on the facts of this case, we conclude that the trial court's finding, that the disconnection of the Moraines territory would not cause the Village to suffer undue

harm through the loss of tax revenue in the future, was not against the manifest weight of the evidence.

Finally, in the Campton Farms case, Catalano estimated that the Village's loss of state-shared revenue from the disconnection would be $3,444 in 2008, and $37,304 over a 10-year period. Catalano stated that the loss of $3,444 would "unduly harm" the Village. However, she also stated that the loss of even $1 would unduly harm the Village. Clearly, the Village failed to make a distinction between a disconnection that causes some harm and one that causes "undue harm." As stated, virtually every disconnection will cause some harm to the municipality through the loss of some tax revenue. However, the loss must be so substantial that it will "unduly" harm the municipality in the future. In Sun Electric, we found that the loss of 26% of a municipality's tax revenue did not cause "undue" harm, sufficient to prevent the disconnection. Sun Electric, 59 Ill. App. 3d at 614.

In the present case, the trial court noted that there would be a loss of only .002319% of the Village's projected revenue in 2008, which is approximately two-tenths of one percent of the Village's revenue. The actual loss, though, would be even less of the Village's revenues. Catalano calculated that the total income for the Village in 2008 would be in excess of $1.8 million, and that its expenses would be only $1,484,770. Thus, it would have a surplus in excess of $350,000. Moreover, this figure did not take into account the expected increase in population, which would increase the revenue coffers, giving the Village a surplus of over $500,000.

Of course, these figures did not take into account other sources of revenue available to the Village such as sales taxes, liquor licenses, vehicle registrations, and fees charged to developers for annexations, preliminary plans, and final plat approvals. Based on the facts of this case, we conclude

that the trial court's finding, that the disconnection of the Campton Farms territory would not cause the Village to suffer undue harm through the loss of tax revenue in the future, was not against the manifest weight of the evidence.

### IX. Cumulative Impact of Pending Disconnection Cases

Last, the Village points out that there are currently 16 petitions for disconnection from the Village still pending in the trial court. At trial, the Village attempted to present evidence regarding the possible impact of these multiple cases. Specifically, the Village sought to introduce evidence that granting multiple disconnections would unduly harm the Village through the loss of tax revenue in the future. The trial court refused to consider such evidence, and the Village contends that its refusal "ignored the economic reality presented by disconnection." The Village asserts that the disconnection statute does not by its terms limit the scope of "undue harm" to a single, pending disconnection but clearly looks to the "current and prospective" overall financial health and viability of a village.

Contrary to the Village's argument, a court cannot speculate as to future events; it is the state of affairs at the time of the hearing that controls, not the factual situation a litigant might desire. City of De Kalb v. Town of Cortland, 233 Ill. App. 3d 307, 311 (1992). While any disconnection will almost certainly deprive a municipality of some revenue, a village must show a significant loss. The loss of future tax revenue of the pending cases has no bearing here. Even if the cases had been decided, it might not necessarily be sufficient to bar disconnection. See Village of Mettawa, 249 Ill. App. 3d at 571.

Furthermore, an attempt to introduce evidence relating to other disconnection cases amounts to an attempt to rewrite the disconnection statute. Under the statute, a territory may disconnect if

its disconnection will not "unduly harm" the municipality. To require a showing that all pending disconnections, taken together, will not "unduly harm" the Village would saddle each petitioner with a much heavier burden. The disconnection statute does not place such a burden on petitioners.

We further agree that the Village's argument would lead to absurd results. Petitioners would be barred from disconnecting simply because another unrelated disconnection action would be deemed to be "too large," and they therefore would be held hostage to other proceedings over which they have no control. Also, administration in most cases would be impractical. The parties would have to conduct discovery into the merits of all of the other cases, and, although the petitions most likely would be staggered over many months, it would be difficult to conduct an evidentiary hearing on any one petition until all of the petitions could be heard.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

McLAREN and BOWMAN, JJ., concur.